LEONA E. HANSEN v. ST. PAUL CITY RAILWAY
COMPANY AND ANOTHER.[1]

June 16, 1950.

No. 35,117.

---

[1]Reported in 43 N. W. (2d) 260.

*C. J. Menz* and *F. X. Cronan,* for appellants.
*Randall, Smith, Blomquist & Krawetz,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the district court denying defendants' motion for judgment notwithstanding the verdict or a new trial.

The action was brought by Leona E. Hansen, special administratrix of the estate of Bernard N. Hansen, against the St. Paul City Railway Company and Wilbur Newton, one of its employes. The trial before a jury resulted in a verdict of $10,000 in favor of plaintiff. Because of events occurring during the course of the trial, we are compelled to reverse the order denying defendants' motion for a new trial.

Since our decision does not depend upon any detailed facts preceding the death of plaintiff's intestate, a brief statement thereof will be sufficient. On November 17, 1946, at about 2:15 a.m., Bernard N. Hansen, aged 29 years, was riding as a passenger on a streetcar owned by defendant corporation and operated by defendant Newton. As the streetcar was proceeding west on Thomas avenue, between Western avenue and Arundel street in St. Paul, decedent either fell or stepped from the rear of the car and suffered injuries which resulted in his death.

The principal disputed fact questions are (1) whether decedent forced open the streetcar doors, or (2) whether, the doors being

open, decedent stepped from the moving streetcar or fell because of the so-called side-to-side swaying or irregular motions of the car.

Defendants made several assignments of error, but, inasmuch as we are remanding the case for a new trial because of events occurring during the trial, we shall consider only the assignment to the effect that the gratuitous observations, remarks, and reprimands of the trial court prejudiced defendants' case and deprived them of a fair trial.

Witnesses for plaintiff included a number of persons who were fellow passengers of decedent at the time of the accident. One of them, Norman Joeb, described certain actions which occurred as the streetcar traveled from Western avenue toward Arundel. In an apparent effort to place these facts in a proper time sequence, defendants' attorney asked, "And of course, time was passing while all these things were taking place, that is true is it not?" No objection was made by plaintiff's counsel to the question, but the court on its own initiative asked, "Isn't that an absurd question?" Defendants' attorney said, "I submit the question," and the court injected, "Time passes, certainly, it passes all the time. These last few questions are just taking up the record." Counsel for defendants then stepped to the bench and excepted to interjections which he claimed the court was putting into the record from time to time when no objection was made by opposing counsel. Thereupon the court asked counsel if he wanted to correct it and was told "No." The court then said, "I think I will cure the record for you," and instructed the jury to disregard any remarks made. The court also offered to make a statement in connection with any previous remarks which might be deemed prejudicial to defendants, stating that it did not wish to prejudice either side and was not interested in who won the lawsuit, but only in the propriety of the questions and orderly process.

Somewhat similar questions addressed to the witness Clarence Dylkowski by defendants' attorney were termed by the court as "obvious." For example:

"The Court: It is obvious that the car was on the rails and kept moving all the time and was getting nearer to Arundel Street.

"Mr. Menz: I wish to indicate the lapse of time so the jury will understand it and that is the purpose of the question.

"The Court: They certainly can understand it is getting close to Arundel Street if it is going west. I think the record is too long. It takes too much time for things that are perfectly obvious. You can have an exception, but I won't apologize this time."

During the direct examination of one Paul Francis Newhower by defendants' counsel, the witness, a repairman for the street railway company, was asked a question with reference to his purpose in opening certain rear streetcar doors without going to the front end of the car. The objection to this question was sustained. The record then shows the following:

"Mr. Menz: I offer to prove by this man that he has done this thing when he wanted to go out the back end of such a car for the purpose of avoiding stepping up to the front end and back to the rear end so that he might alight from the rear end.

"The Court: It is so obvious.

"Mr. Menz: I am going to make my record in this case.

"The Court: That you want to make. I think your record is ridiculous. Nobody could ever go up to the Supreme Court on the record you made. You take too much time. You repeat everything. It is not even disputed in this case, there is no claim that anybody threw a back switch to open the doors. Of course, he opened them to get out. Did he want to play with them?"

In an apparent effort to elicit testimony from the witness concerning the method by which similar streetcar doors were opened on other occasions, defendants' attorney asked, "How did you see them open the rear doors?" and then the court volunteered this answer: "He saw them open by looking at them."

On another occasion defendants' counsel was questioning a repairman, Frank Milford, with reference to the method of opening the rear doors. He said, "The question is have you done that, opened

them in that way?" The witness asked, "When they are normal?" and then replied, "No, I have not because you can't open them when they are shut." Counsel then said, "You don't understand the word 'normal'. * * * I have assumed for the purpose of my question—" At this point the court interrupted and asked counsel, "Why do you assume he does not understand the word 'normal'?" Counsel replied, "Because he refers to it as meaning when they are fully shut." To this the court answered, "I do not think you are the one to say whether he does or not." Further questioning of this witness culminated in this discussion between the court and counsel:

"The Court: I would say, Mr. Menz, the difficulty is that he listened to the other witness and the other witness described them.

"Mr. Menz: I do not know what the other witness said and I do not know what the mental operation of this witness is and I do not think the Court does either.

"The Court: I am not supposed to, like a magic wand."

Counsel at this point again took "exception to the tactics of the Court, interrupting the examination of the witness with suggestions and interjections at a time when there is no question to rule upon, when no objection is pending before the Court, and constantly doing it in a way that I believe is prejudicial to the attorney for defendants and the defendants." When counsel completed the statement of his objection, the court said:

"Let's make a record. The Court has said what it has stated because of the absurdities and the improper suggestions and questions of counsel in examining his witnesses. He has just asked a question of the witness and then made remarks to the jury that the witness did not understand the meaning of the word 'normal condition', attempting to change the testimony of this witness to conform to the desire of counsel rather than conforming to the facts adduced in the evidence, and has persisted in reiterating admitted facts and has persisted in asking questions which the Court has ruled out and has persisted in encumbering the record unneces-

sarily and at great length, although admonished by the Court on many occasions."

Later, the record shows the following comments made by the court during examination of defendant Newton:

"The Court: Why encumber the record with a lot of statements like that? We know he was the motorman and we know this man was on the car. There is no dispute about it.

"Mr. Menz: I want to show when he first had his attention directed to this man.

"The Court: You said 'there came a time when he was there,' Of course, there came a time when he was there, he got on the car. The Court is objecting to the unnecessary questions which take up the time of this Court. I want you to desist.

"Mr. Menz: Again the defendant excepts to the remarks of the Court as being prejudicial and uncalled for.

"The Court: They are not intended to prejudice your client, but I want you to desist from these unnecessary and ridiculous questions.

"Mr. Menz: I want the record to show that these last remarks of the Court were made in an audible tone, in the hearing of the jury.

"The Court: That is the only way I can control you.

"Mr. Menz: Including the last remark of the Court."

An interrogatory framed by defendants' attorney during the examination of an expert witness was described by the trial court as "too much involved even for you."

In his closing argument, defendants' attorney apparently attempted to correct what he thought might have been a bad impression created by various comments by the court. He said that he had practiced law before the courts of the State of Minnesota and the United States for about 35 years and that up to that time no finger of suspicion had ever been pointed against him. After this statement the following occurred:

"The Court: How long you have practiced law and before what courts, and whether or not the finger of disapproval has been pointed at you, is not in evidence and it is improper for you to make such statement and the Court asks you not to make it and asks you not to make any statement similar.

"Mr. Menz: With all due respect to the Court, Your Honor, I claim I have the right to make the statement I am making and I am practically finished with it, but I insist that the statement I propose to make and with which I am practically finished is properly part of the record.

"The Court: You will not insist on making it without being in contempt of this Court so you should desist."

■ It is apparent here from an examination of the record that because of the numerous more or less caustic clashes between the court and counsel for defendants, many of which occurred in the presence of the jury, the interests of justice will be best served by a new trial, with some of these incidents eliminated. After all, the real object of a trial is to secure a fair and impartial administration of justice between the parties to the litigation. 64 C. J., Trial, § 91; 53 Am. Jur., Trial, § 74. The responsibility of striving for an atmosphere of impartiality during the course of a trial rests upon the trial judge. His conduct in trying a case must be fair to both sides, and he should refrain from remarks which might injure either of the parties to the litigation. Since the judge's duties are of a judicial nature, he should not act as counsel for a party by raising objections which the party should make. To assume a partisan position "is to desert the high position to which the judge is elevated, and assume the role of the advocate." Koontz v. State, 10 Okl. Cr. 553, 561, 139 P. 842, 845, Ann. Cas. 1916A, 689.

■ While it is undoubtedly within the province of the trial judge to admonish and rebuke counsel when guilty of misconduct, it is improper for him to unduly criticize counsel in the presence of the jury or make remarks in the course of the trial showing bias in favor of one of the parties or which will tend to incite hostility or prejudice in the minds of the jury toward one party

and sympathy for another. To threaten to punish counsel for contempt if he persists in offering certain evidence or makes objections to offers of testimony is misconduct where counsel acts in good faith and where the objections are proper, and may constitute reversible error. 53 Am. Jur., Trial, § 90.

These general principles have formed implicit bases for decisions of our courts, including I. J. Bartlett Co. v. Ness, 156 Minn. 407, 195 N. W. 39. There the discrediting attitude toward counsel and a witness by the trial court was held to have prejudicially affected plaintiff's contentions in respect to a usury charge, and a new trial was granted. In that case, this court, speaking through Mr. Justice Holt, said (156 Minn. 412, 195 N. W. 41):

"Jurors are prone to look for an indication as to which litigant ought to prevail in the attitude and remarks of the trial judge."

In State v. Jensen, 151 Minn. 174, 178, 186 N. W. 581, 583, we approved authorities holding that "The use by the trial judge in the presence of the jury, of language which tends to bring an attorney in the case into contempt before the jury has been held a sufficient ground for setting aside the verdict."

The courts represent the principle of justice under the law. The position of a trial judge is a powerful one, not only because of the high individual attainments generally characteristic of men chosen to serve as district judges, but also because of the great respect which the public generally feels toward our district courts as venerable institutions. The influence of the trial court is especially great among the jurors, who, called upon to perform unaccustomed duties in strange surroundings, tend to seek from the court some hint or suggestion as to how their decision is to be reached. Thus, the extraordinary prestige of the trial judge, based upon public confidence in his fairness and integrity, creates in turn an extraordinary obligation to refrain from any act, word, sign, gesture, or inflection of voice, the effects of which would be to emphasize a predisposition on the part of the court toward one side or the other in connection with the legal controversy. Where, as here, the record

shows a departure from this standard which might have prejudiced the rights of the losing party, we are compelled to direct a new trial.
Reversed.

MR. JUSTICE THEODORE CHRISTIANSON, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.