**STATE of Minnesota, Respondent,**

v.

**Leonard Joseph RICHARDS, Appellant.**

No. CX–91–1409.

Supreme Court of Minnesota.

Dec. 31, 1992.

**190**

John M. Stuart, State Public Defender, Melissa Sheridan, Asst. State Public Defender, St. Paul, for appellant.

Leonard J. Richards, pro se.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Hennepin County Atty., Lee W. Barry, Sr. Asst. County Atty., Minneapolis, for respondent.

WAHL, Justice.

Defendant Leonard Joseph Richards appeals his conviction, by jury verdict, of premeditated first degree murder[1] in the death of attorney Robert Stratton. Defendant's previous conviction for Stratton's premeditated first degree murder was reversed by this court when defendant successfully argued that he had been denied his right of self-representation. *State v. Richards*, 456 N.W.2d 260 (Minn.1990). At the second trial, defendant represented himself with the able assistance of appointed standby counsel and was again convicted and sentenced to life imprisonment.

The primary issues raised on appeal are whether the defendant was deprived of his constitutional right to a fair trial by the trial court judge's restrictions on his right to testify, his right to present evidence, his right to cross-examine witnesses, and his right to represent himself effectively; and whether his constitutional right to due process of law was violated when the trial court denied him access to a defense psychiatrist for assistance in preparing and presenting his mental illness defense and

precluded the introduction of any evidence in support of that defense. After a careful review of the law and the record,[2] we affirm the conviction.

On February 23, 1987, Barbara Lyke, Robert Stratton's receptionist, saw Stratton leave the office at about 1:15 p.m. with the defendant, Leonard Richards. Stratton told her that he and Richards were going to lunch and that he would be back later. Lyke never saw him again.

Although defendant maintained a residence at 3805 29th Avenue South in Minneapolis, he had lived at 1707 2nd Avenue North with Linda Winbush and two of her sons since November of 1986. Winbush testified that, in the days leading up to February 23, defendant instructed her to clean the basement in preparation for a client meeting he had scheduled for that day. Defendant covered the basement windows over with spray paint and contact paper and installed new latches on them. On February 23, defendant drove Winbush to a relative's home in Blaine where her children had spent the weekend. When he returned at about 11:00 p.m. to pick them up, Winbush noticed dark spots on his jeans which defendant said were paint. On the way home, defendant warned Winbush not to go into the basement because an electrician had been working down there. Once home, Winbush observed that the stairway to the second floor and the basement stairs were wet. She also noticed that a sheet that had been hung in the children's bedroom as a room divider was missing, as was the sheet from her bed.

The next morning, after her older son had gone to school, Winbush discovered blood spots in the children's bedroom. Taking care that defendant did not see her, Winbush blotted up some of the blood with a tissue which she then hid inside the lining of her coat. Later that morning, defendant drove Winbush and her other son to a Banks store and left them with a $100 bill and instructions to spend the day shopping. As soon as defendant drove away, Winbush

---

1. Pursuant to Minn.Stat. § 609.185(1).

2. The record includes a transcript of approximately 11,000 pages bound in 87 volumes.

contacted the Minneapolis police and told them she feared "something horrible" had happened at her house. After the police tested the tissue and confirmed that it contained blood, Winbush signed a consent form giving the police permission to search her home.

Upon arriving at 1707 2nd Avenue North, Winbush remained in the squad car while the police approached the house. After knocking for almost ten minutes, the officers spotted Richards through a window and forcibly entered the dwelling. Once defendant was restrained, one of the officers went down into the basement where he found Stratton's nude corpse wrapped in a bed sheet. Defendant was arrested and the police departed to obtain a search warrant for the premises.

During the execution of this search warrant, police officers seized a number of items which were later introduced as evidence at trial. Near the body in the basement, officers found a maul, an axe, a pair of sidecutters, and garbage bags filled with bloody paper towels and clothing. They found a brand new jigsaw with a sales receipt indicating it had been purchased at Target on the evening of February 23. Upstairs, officers discovered a stungun, a can of mace, a box of pistols, and an expended bullet. The officers found a calendar on which the date February 23 was highlighted in blue and yellow and contained the notation "Noon, have lunch." They also seized a number of papers, including a document purporting to be a signed, notarized affidavit of Robert Stratton. A trail of wetness was observed leading from an upstairs room, down the stairway and through the ground level of the house to the basement stairs. Behind the living room sofa, an officer found a pair of blood-spattered jeans which Linda Winbush identified as those worn by defendant when he picked her up in Blaine on the night of February 23.

An autopsy indicated that Stratton had died as a result of a close-range gun shot wound to the base of his skull and that his body had been dragged some distance after death. Forensic testing of various blood-stains found at 1707 2nd Avenue North showed them to be consistent with the blood of Robert Stratton. A ballistics expert determined that the expended bullet had been recently fired from one of the pistols found in the house.

At trial, the state advanced the theory that defendant had killed Stratton to prevent him from turning over documents to the IRS which would have implicated defendant in tax fraud. Stratton had been scheduled to meet with an IRS investigator on February 25, two days after he was killed. Testimony was offered showing that the "Stratton affidavit," which essentially exculpated defendant of any tax misconduct, had been written by defendant, not Stratton.

Defendant's second trial for the premeditated murder of Robert Stratton was bifurcated because defendant, following jury selection, had interposed a plea of not guilty by reason of mental illness or deficiency. At the close of the guilt phase of the trial, the jury found that the elements of first degree murder had been proven beyond a reasonable doubt. At the mental illness phase, the trial court, pursuant to Minn. R.Crim.P. 20.02, subd. 3, prohibited the defendant from introducing evidence of his mental condition. The jury returned a verdict of guilty of first degree premeditated murder.

I.

Defendant contends that he was denied his constitutional right to a fair trial by unreasonable restrictions placed by the trial court on his right to testify, his right to present evidence, his right to cross-examine witnesses, and his right to effective representation. Under our system of jurisprudence, every criminal defendant has the right to be treated with fundamental fairness and "afforded a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984). The due process clauses of the Fourteenth Amendment of the United States Constitution and Article I, section 7 of the Minnesota Constitution require no less.

*Right to Testify.*

Defendant claims first that the trial court prevented him from fully exercising his constitutional right to testify in his own defense because he was not allowed to introduce certain evidence through his own testimony. "[I]t cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." *Rock v. Arkansas*, 483 U.S. 44, 49, 107 S.Ct. 2704, 2708, 97 L.Ed.2d 37 (1987). Defendant was not permitted to testify about everything he wished to address; however, as the examples which follow indicate, defendant was allowed to testify until his testimony ran afoul of the rules of evidence.

Contrary to his assertion that he was not allowed to introduce evidence of his theory that Robert Stratton was murdered, not by him, but by three other men, defendant was allowed to testify about the relationship between Gary and Jack Thomas and Robert Stratton.[3] Though defendant argues that he was not able to testify fully because the court cut him off, he was on the stand for more than 10 hours over the course of four days. The court only cut defendant off after warning him that he had thirty minutes left to testify and allowing him to make an offer of proof. Before his testimony was halted, defendant was allowed to testify as to who, in his view, killed Robert Stratton.

Defendant claims he was not allowed to testify in depth about his relationship to Peel Realty and the Alango Trust. However, the transcript contains 30 pages of his testimony regarding these entities.

The trial transcript likewise belies defendants claim that he was prevented from testifying that he never received notice of an IRS summons regarding Peel and Alango.

Q: Leonard, did you ever get any notice, either—well, first of all, did you ever get any notice from the IRS regarding the summons with respect to either Peel Realty or Alango Trust?

A: No, I did not.

Defendant was not permitted to relate the contents of a conversation he had with Stratton on February 23, 1987, concerning Stratton's plans to have some documents notarized later in the day. A hearsay objection was properly sustained.

Defendant complains that he was not allowed to testify about an investigation he was asked by Stratton to make of Linda Winbush and her relatives in 1986. Defendant did in fact testify on this subject, but this testimony was limited for reasons of relevancy and remoteness in time.

Defendant was not permitted to testify as to the content of the missing pages of the "Stratton Affidavit" because it was properly ruled inadmissible hearsay.

Defendant complains that he was not allowed to impeach Linda Winbush's testimony. His testimony was limited because of hearsay problems. Although he was not allowed to testify about what Winbush said to him, he was able to testify about what he said to her.

Defendant was not permitted to testify as to what the arresting officers said to him because of sustained hearsay and relevancy objections.

With regard to how Stratton's personal property and other items of physical evidence came to be at 1707 2nd Avenue North, defendant was able to testify that he did not put them there. He was not allowed to testify as to what he had been told by others because that information was ruled inadmissible hearsay.

When a criminal defendant's right to testify conflicts with a state rule of evidence, the constitution demands that restrictions imposed on that right "not be arbitrary or disproportionate to the purposes they are designed to serve." *Rock v.*

---

**3.** The Thomas brothers, nephews of Linda Winbush, are two of the men defendant claims killed Stratton. Both of the Thomas brothers were available for cross-examination following their testimony on direct that they had never met Stratton. The defense did not cross-examine Gary Thomas at all. Jack Thomas was cross-examined only briefly on this subject and testified that he did not remember ever meeting anyone at Stratton's law office and did not recognize a photograph of Stratton.

*Arkansas*, 483 U.S. at 56, 107 S.Ct. at 2711. The limitations placed on defendant's testimony were not arbitrarily made by a trial court judge keeping an eye on the clock. Most of the excluded testimony was irrelevant, inadmissible hearsay, or capable of creating confusion or undue delay. The exclusions were made to aid the jury in discerning the truth; they did not impermissibly prevent defendant from testifying in his own defense.

### Right to Present an Effective Defense.

■ Defendant also claims he was denied the right to present an effective defense. As the United States Supreme Court has made clear, "[t]he rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." *Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973). Defendant claims he was denied both of these fundamental rights when the trial court imposed the following limitations on the conduct of the proceedings.

■ Defendant was not allowed to call his own tax and accounting experts to counter the state's theory regarding his motive to kill Stratton. Because the state was not seeking to litigate the tax matters within this murder trial, only the existence of the investigation, not its conclusion, was relevant.

Defendant was not allowed to call as a witness an accountant from Coopers & Lybrand, the accounting firm that performed an audit on which one of the state's experts based his testimony. Because defendant could not make an offer of proof to challenge the accuracy of the audit documents, the judge refused to let him go on a fishing expedition.

DNA expert Dr. Edward Blake was not permitted to take the witness stand to testify that tissue found under Stratton's fingernails did not come from defendant, but rather was Stratton's own tissue, indicating that Stratton did not scratch defendant. The prosecution, however, never argued that scratches found on defendant's body

after his arrest were caused by Stratton. Furthermore, Dr. Blake's testimony would only have confirmed a conclusion drawn by the state's expert. Finally, Dr. Blake's test results were later entered into evidence through the testimony of another defense expert.

Defendant's serological expert was allowed to testify, but the judge would not let her critique the methods used by the state's expert where they both reached the same results.

The defense was precluded from introducing evidence of cocaine found in Stratton's body at the autopsy because no offer of proof was made as to its relevance.

■ Defendant was not permitted to call Sergeant Robert Nelson to the stand to question him about false information in his affidavit supporting the search warrant for 1707 2nd Avenue North. Defendant cross-examined Nelson over the course of four days during which he could have asked about the affidavit. Furthermore, the appropriate time to challenge an affidavit in support of a search warrant is at the omnibus hearing. *See State v. Luciow,* 308 Minn. 6, 240 N.W.2d 833 (1976).

Defendant was not allowed to call Ron Adler and Bob Bernick, two investigators assigned to the case by the county attorney. Adler was cross-examined extensively during the state's case-in-chief. Thereafter, defendant indicated that he wanted the opportunity to ask questions outside the scope of the direct examination, but failed to make an offer of proof to justify recalling Adler. Defendant's offer of proof concerning Bernick's expected testimony revealed that defendant was on a fishing expedition: "We are investigating, that's all."

Defendant complains that he was not able to question fully investigating officer Mark Ellenberg. A limited offer of proof had been made as to this witness regarding cigarettes found at the scene, so questioning was restricted to that limited area. The court previously determined that only two of the four investigating officers need-

ed to be allowed to testify pursuant to this limited offer of proof.

The defense was not permitted to call Michelle Bateson and Jerry McFarland, two of the four officers who arrested notary public Marilyn Whaley, because their testimony would have been cumulative of that already given by Sergeants Nelson and Snobeck.

■ The defense was not permitted to call Jill Seachrist and Bonnie Martz, both of whom were expected to testify about prior statements made to them by Linda Winbush which were inconsistent with her trial testimony. Extrinsic evidence of a prior inconsistent statement by a witness cannot be admitted unless that witness is afforded a prior opportunity to explain or deny. Minn.R.Evid. 613(b). Winbush was not confronted with these statements on cross-examination, so this extrinsic evidence was properly excluded.[4]

The court struck Dale Sizemore from the defense witness list when defendant admitted that he did not know Sizemore's whereabouts and had not subpoenaed him.

The court allowed the name of Robert McGuire, an attorney with whom Stratton held a deposition on the morning of February 23, 1987, to be placed on the defense witness list. Later, McGuire and Patsy Boles, the client who had been deposed, were stricken following inadequate offers of proof. The court similarly struck Stratton's sister and several of his friends who were expected to testify as to Stratton's demeanor prior to his death.

Edwin Elmer was stricken from the defense witness list. He was expected to "testify about Myra Montgomery, her patterns of truthfulness, her reputation for such, and the reasons why she stopped being on that premise." Montgomery was the first witness called by the defense. It is not clear from the record whether Elmer's testimony was being offered by the defense to impeach its own witness or to bolster her credibility. If it was the latter, such testimony was inadmissible because

Montgomery's character for truthfulness had not been attacked. Minn.R.Evid. 608(a).

■ Defendant was not allowed to call the tailor who made the pants he was wearing at the time of his arrest. He wanted to prove through this witness that he could not have fit into the pair of bloody jeans later found at the scene. Because both the pants and jeans were in evidence, the jurors were capable of making their own size comparison. Expert testimony was not necessary. *See* Minn.R.Evid. 702.

Defendant further asserts that the trial court terminated his direct examination of three defense witnesses. During Myra Montgomery's direct examination, the court warned defendant that he could ask ten more questions. After defendant persisted in asking irrelevant and argumentative questions, the court cut him off. He was, however, permitted to question this witness on re-direct until he indicated he had nothing further. The direct examination of the other two witnesses was not terminated by the court. The judge cautioned defendant that he could ask five more questions of David Baker and three more relevant questions of Duane Ittner. Nevertheless, defendant was permitted to continue with both witnesses until indicating he had no further questions.

■ "The right to offer the testimony of witnesses * * * is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). Recognizing the importance of this right, this court has frowned on the practice of limiting the number of witnesses at trial. "We approve of the rule that upon the vital controverted issue in a case the trial court should refrain from any attempt to limit the number of the witnesses that a party may offer, unless a purpose to trifle with the administration of justice becomes apparent." *State v.*

---

**4.** Further, the judge found that the offer of proof for Seachrist's testimony was inadequate and that affidavits executed by Bonnie Martz violated Rule 9 discovery.

*Randall,* 143 Minn. 203, 209, 173 N.W. 425, 428 (1919). It follows, therefore, that if witnesses are offered for the purpose of testifying about collateral matters or to impede the judicial process, the trial court then is justified in placing limitations on their number.

While it is true that a significant number of defense witnesses were stricken, the process employed by the court was neither arbitrary nor mechanical. The judge proceeded down the defense witness list in an orderly manner and asked for an offer of proof as to each person named. If defendant made an inadequate offer, admitted he had no idea of what the witness would say, or indicated that a witness' whereabouts were unknown, then that witness was stricken.

 Although the right to present witnesses is constitutionally protected, the accused "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers,* 410 U.S. at 302, 93 S.Ct. at 1049. These same principles should guide the court in reasonably controlling the trial process. *See* Minn.R.Evid. 611(a). It was well within the discretion of the trial judge to regulate the presentation and direct examination of the defense witnesses. *See Batsell v. United States,* 403 F.2d 395, 401 (8th Cir.1968).

Finally, defendant claims that his cross-examination of seven of the state's witnesses was prematurely halted by the court. During the omnibus hearing, defendant was told he had ten minutes to complete his cross-examination of Sergeant Snobeck. He was cut off when he continued to ask objectionable questions. Sergeant Nelson's omnibus cross-examination spanned two days. Defendant was cut off when he refused to ask any more questions without consulting his advisory counsel. Defendant was told he could call Nelson as his own witness and he later did so. Defendant's direct, not cross, examination of Linda Winbush at the omnibus hearing was halted at 1:15 a.m., after 4½ hours of questioning.

At the trial, the court warned defendant that he had ten more questions to ask of Sergeant Nelson on cross-examination. After permitting more than ten questions, the court finally cut defendant off, but did not limit him on re-cross. Defendant's cross-examination of Jim Diracles was lengthy relative to the state's direct. After advising defendant that he had ten more questions, the court cut him off. The cross-examination of Paul Walsh lasted for parts of three days. The judge warned defendant that he had about ten questions left before terminating the cross-examination. Karen Preston testified briefly for the state, but her cross-examination was lengthy. The defense was told it had two more questions before being cut off.

Defendant does not complain that he was prevented from cross-examining the state's witnesses, but rather complains that his questioning was terminated before he was finished. The judge was under no obligation to permit Richards to cross-examine a witness indefinitely. "[T]he right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers,* 410 U.S. at 295, 93 S.Ct. at 1046. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986).

*Right to Effective Advocacy.*

Defendant claims that restrictions imposed on him by the court's regulation of the proceedings abridged his right to effective advocacy in violation of due process. He points to the following examples.

Defendant cites approximately 70 occasions when he and his advisory counsel were prohibited from making offers of proof. On three of these occasions, defendant requested a bench conference and did not ask to make an offer of proof. Once he

asked to be allowed to cite authority in support of his cross-examination rather than to make an offer of proof. On two of the cited occasions, the defense *was* permitted to make an offer of proof. Finally, 43 of the cited examples occurred during the omnibus hearing at which defendant asked a number of questions unrelated to the evidentiary issues at hand.

 Defendant complains that the physical restrictions placed on him at trial diminished his ability to represent himself effectively. On several occasions, defendant asked the court for permission to move freely about the courtroom during the presentation of his case. These requests were denied for security reasons [5] and defendant was required to remain seated at the counsel table. For the safety of the witnesses, jury, judge, counsel and court personnel, defendant also was not permitted to participate personally in any conferences held at the bench or in chambers, a number of which were conducted off the record.

 Defendant's objection to this treatment stemmed from his perception that any apparent inequality between him as a self-representor and the prosecutor would place him in an unfavorable light in the minds of the jurors. However, "[i]t is not the trial court's duty to remove all obstacles from the path of the party who has elected to represent himself." *People v. Rice*, 40 Colo.App. 357, 579 P.2d 647, 650 (1978). Because defendant chose to manage his own defense, he "relinquishe[d], as a purely factual matter, many of the traditional benefits associated with the right to counsel." *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975). Furthermore, security measures more obvious than those employed in this case have been found not to deny due process.[6] The court's insistence on these measures did not deny defendant due process of law.

 Defendant next argues that his exclusion from bench and chambers conferences violated his right to be present at all stages of the trial. *See* Minn.R.Crim.P. 26.03. Standby counsel had been appointed as required to ensure defendant a fair trial. Defendant at the outset indicated his desire to have his standby counsel argue motions for him. He makes no claim that his advisory counsel were ill-equipped to handle the bench and chambers conferences or that their participation was unsolicited. *Cf. McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). Defendant's additional presence at the conferences would not have "contribute[d] to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S.Ct. 2658, 2667, 96 L.Ed.2d 631 (1987). Furthermore, defendant's right to be present at all stages of the trial is not so absolute as to require jeopardizing the safety of those present in the courtroom.

 The trial court did not allow defendant to consult with his standby counsel at length after every question but regulated consultation. As the state has noted, defendant consulted with standby counsel over 175 times during the course of his jury trial.

On the record before us, we find no abuse of the discretion given the trial court by Minn.R.Evid. 611(a) to control the proceedings so as to ascertain the truth and avoid needless consumption of time nor do we find any unreasonable restriction of defendant's consultation right.

 Defendant argues that his right to prepare an effective opening statement was violated. Although he demanded that the trial start on February 25, defendant complained that he was unprepared when the trial later began on May 14, 1991. The judge told defendant that he was free to wait until after the state rested to give his

---

**5.** Handguns, a stungun, ammunition, axes and mace were in evidence and in the courtroom.

**6.** *See State v. Aguilar*, 352 N.W.2d 395 (Minn. 1984) (weapons check of persons entering courtroom); *United States v. Carter*, 815 F.2d 1230

(8th Cir.1987) (metal detector outside courtroom); *Clark v. Wood*, 823 F.2d 1241 (8th Cir. 1987) (defendant handcuffed outside courtroom).

opening statement; defendant chose not to wait.

██ Without any citations to the record, defendant asserts that throughout the trial, the judge made prejudicial comments and exhibited hostility and impatience toward the defense in the presence of the jury. Generally, the judge conducted himself admirably under circumstances which were, at times, trying. Moreover, the trial court has broad discretion in dealing with "disruptive, contumacious, stubbornly defiant defendants * * * *. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations." *Illinois v. Allen*, 397 U.S. 337, 343, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). The trial court properly exercised that discretion.

██ Finally, defendant objects to the trial court's handling of the closing arguments. First, he challenges the three hour time limit placed on each side. However, "[t]he limitation of time for arguments of counsel is within the sound discretion of the trial judge." *United States v. Bednar*, 728 F.2d 1043, 1049 (8th Cir.1984) (limitation of twenty minutes not abuse of discretion); *see also Capriola v. United States*, 61 F.2d 5 (7th Cir.1932) (two hour limit not abuse of discretion).

██ Second, defendant claims that he and his advisory counsel were improperly "castigated and threatened" by the court during the state's final argument. When defendant began interrupting the prosecutor's argument with objections, the judge overruled them and instructed defendant to make legal objections. "[I]t is undoubtedly within the province of the trial judge to admonish and rebuke counsel when guilty of misconduct * * * *." *Hansen v. St. Paul City Ry. Co.*, 231 Minn. 354, 360, 43 N.W.2d 260, 264 (1950). Defendant's behavior was "disorderly, disruptive, and disrespectful." *Allen*, 397 U.S. at 343, 90 S.Ct. at 1060. The trial court was well within the bounds of the constitution in handling defendant as it did.

We have considered and find no merit in defendant's arguments that he was denied a speedy trial when the trial did not begin on February 25, 1991; that he was denied a public trial because one day the omnibus hearing went beyond "normal business hours;" and that he was denied his right to disqualify the presiding judge.

Defendant is constitutionally guaranteed a fair trial, not a perfect one. The trial was long and difficult. The trial court properly controlled the presentation of evidence and maintained the decorum and security of the courtroom without depriving defendant of his constitutional right to a fair trial. *See Batsell v. United States*, 403 F.2d at 401; *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).

## II.

██ Defendant alleges that his constitutional right to due process of law was violated when he was denied access to a court-appointed defense psychiatrist to assist him in preparing and presenting his mental illness defense and was precluded from presenting any evidence in support of that defense. During the omnibus hearing, defendant announced his intention to plead not guilty by reason of mental illness or deficiency pursuant to Minn.R.Crim.P. 14.-01(c). Based on defendant's competent self-representation during voir dire, the trial court at first denied his request for a court-appointed psychiatrist.

The United States Supreme Court has held:

> [W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985). In addition, Minn.Stat. § 611.21 (1990) requires the court to authorize expert witness fees for an indigent defendant if it finds that the expert services are necessary. Such a finding is possible only if the defendant presents the trial court with

some specific evidence that the expert's testimony is necessary to the defense. *See State v. Volker*, 477 N.W.2d 909, 911 (Minn.Ct.App.1991). *Ake* similarly requires a threshold showing of need. *Ake*, 470 U.S. at 82–83, 105 S.Ct. at 1095–1096 (defendant demonstrates the need for psychiatric assistance by making an *ex parte* threshold showing to the trial court). Because defendant's assertion of the insanity defense was not accompanied by any factual showing, the court was not required to provide him with a psychiatrist. *Cf. United States v. Sloan*, 776 F.2d 926, 927 (10th Cir.1985) (counsel cited defendant's history of psychiatric treatment in support of request for court-appointed psychiatrist).

Nevertheless, the trial court reconsidered defendant's request for a court-appointed psychiatrist. One of defendant's standby attorneys suggested Dr. Carl Malmquist as a possibility:

MR. McGEE: * * * Dr. Malmquist, because of my experiences with him in the past, would be a consideration. I happen to think that he, in my opinion, is an excellent psychiatrist.

Later in the week, at an *in camera* hearing, the defense indicated no opposition to the choice of Dr. Malmquist. The trial court signed an order appointing Dr. Malmquist to examine defendant pursuant to Minn.R.Crim.P. 20.02, subd. 2. No objection was voiced at that time.

A month later, Dr. Malmquist reported that his psychometrist had been unable to make contact with defendant to perform preliminary testing. Defendant, calling Dr. Malmquist a "court psychiatrist," demanded that the court appoint a "defense consultant psychiatrist." The court declined to do so and, thereafter, defendant steadfastly refused to participate in any psychiatric testing.

■ If a defendant makes the necessary threshold showing required by *Ake*, the state must provide access to a competent psychiatrist who not only will conduct an examination, but also will "assist in evaluation, preparation, and presentation of the defense." *Ake*, 470 U.S. at 83, 105 S.Ct. at 1096. But as the Court noted:

This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the States the decision on how to implement this right.

*Id.* Defendant makes no claim that Dr. Malmquist is incompetent, only that he is "neutral." Nevertheless, as the court explained to defendant when this issue arose, the court intended that Dr. Malmquist make his services and opinion available to the defense as a witness. Defendant cannot complain that he was denied access to a psychiatrist because he chose not to take advantage of Dr. Malmquist's assistance, provided by the court despite the defendant's failure to make the required threshold showing of need.

Defendant's failure to participate in psychiatric testing led the prosecutor to move for and the trial court to impose the sanctions contained in Minn.R.Crim.P. 20.02, subd. 3. Defendant alleges that the imposition of these sanctions violated his right to testify and present a defense.

■ A criminal defendant who chooses to put his sanity in issue is required by Rule 20.02 to submit to an examination by a court-appointed psychiatrist. *See State v. Schneider*, 402 N.W.2d 779, 787 (Minn. 1987). Further, a defendant asserting the mental illness defense must furnish the prosecution with any available medical records of mental examinations performed. Minn.R.Crim.P. 20.03, subd. 1. Defendant's refusal to submit to examination by Dr. Malmquist and his failure to furnish the prosecutor with medical records subjected him to the sanctions of Minn. R.Crim.P. 20.02, subd. 3, which provides:

If the defendant does not participate in the examination so that the examiner is unable to make an adequate report to the court, the court may prohibit the defendant from introducing evidence of the defendant's mental condition, may strike any such evidence previously introduced,

may permit any other party to introduce evidence of defendant's refusal to cooperate and to comment thereon to the trier of the facts, and may make any such other ruling as it deems just.

In exercising the discretion given it under this rule, the trial court determined that defendant would not be allowed to present any evidence of mental illness and limited each side to a fifteen minute final statement to the jury.

The preclusion of evidence is a severe sanction, to be used only as a last resort. *See State v. Vaughn,* 361 N.W.2d 54, 59 (Minn.1985). Nevertheless, "[t]he imposition of sanctions for violations of discovery rules and orders is a matter particularly suited to the judgment and discretion of the trial court." *State v. Lindsey,* 284 N.W.2d 368, 373 (Minn.1979). In exercising this discretion, the trial court should consider: (1) the reason for the discovery violation; (2) prejudice to the opposing party; and (3) feasibility of minimizing such prejudice by a continuance. *Id.* In this case, the state would have been prejudiced by its inability to rebut any evidence of mental illness offered by defendant. Because of defendant's failure to comply with discovery rules, the state was without knowledge of the psychiatric and psychological evidence to be presented. *See United States v. Buchbinder,* 796 F.2d 910, 915 (7th Cir.1986). Based on defendant's refusal to submit to court-ordered testing, a continuance would have been unproductive. Where, as here, the trial court's decision is not a clear abuse of discretion, its ruling will not be overturned. *Lindsey,* 284 N.W.2d at 373.

Defendant was not denied his constitutional right to due process of law by sanctions precluding his presentation of evidence on the mental illness defense where he refused to cooperate with the psychiatrist appointed to assist him and chose not to comply with discovery rules.

### III.

Defendant argues before this court that the trial court admitted evidence which should have been suppressed and that,

without this evidence, a guilty verdict cannot be sustained. This argument is unavailing. At the conclusion of the omnibus hearing, which went on for eight days, the judge asked no less than five times whether the defense wanted to make any motions or bring anything further to the attention of the court. If defendant wished to testify at the omnibus hearing or move to suppress the evidence seized pursuant to warrant, he had ample opportunity to do so.

Had the motion to suppress been made, defendant's only meritorious challenge would have been to the validity of the consent to search given by Linda Winbush. One year after defendant's omnibus hearing, this court in *In the Matter of the Welfare of D.A.G.,* 484 N.W.2d 787, 790 (Minn.1992), concluded that "in a competition between an absent cotenant's right to consent to a search and another cotenant's constitutional right to be free from that warrantless search, the constitutional right must prevail."

The facts and circumstances of defendant's case are distinguishable from those in *D.A.G.* First of all, defendant never contended that he and Winbush were cotenants. Secondly, Winbush, after consenting to the search in writing, rode with the officers to 1707 2nd Avenue North and was present when they executed the search. Finally, even if the consent was invalid, and we find that it was not, the presence of exigent circumstances would have justified a warrantless entry and search.

Finally, defendant claims that he was denied a fair trial because, following jury selection, WCCO–TV aired a segment in which the judge who had presided at the first trial "denounced" him. When this program was brought to the attention of the trial court, the court re-voir dired the jurors. Because none of them saw the program, defendant was not prejudiced by it. *See State v. Beier,* 263 N.W.2d 622 (Minn.1978).

Defendant's trial was not perfect, but it was fair. The evidence against defendant was exceptionally strong. The trial court committed no errors which would have substantially influenced the jury to convict.

*State v. Darveaux*, 318 N.W.2d 44, 48 (Minn.1982). The defendant's conviction for first degree premeditated murder is affirmed.

Affirmed.