*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A22-1283**

State of Minnesota,
Respondent,

vs.

Robert Lee Baker, III,
Appellant.

**Filed November 20, 2023**
**Affirmed**
**Kirk, Judge**[*]
**Concurring specially, Johnson, Judge**

Dakota County District Court
File No. 19HA-CR-20-2829

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Kathryn M. Keena, Dakota County Attorney, Jessica A. Bierwerth, Assistant County Attorney, Hastings, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Steven P. Russett, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Cochran, Presiding Judge; Johnson, Judge; and Kirk,

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.7

**KIRK**, Judge

While sitting in a Dodge Charger driven by his girlfriend, appellant was robbed at gunpoint by two masked assailants. When the armed robbers were fleeing with appellant's property, appellant fired 16 rounds from a .40 caliber handgun. Eleven of the rounds struck one of the assailants, killing him. On this direct appeal from a judgment of conviction for second-degree intentional murder, appellant argues the district court violated his right to present a complete defense, and insists he is entitled to a new trial because the district court refused to instruct the jury on the defense of self and others. We affirm.

## FACTS

On November 9, 2020, at approximately 8:58 p.m., 911 dispatchers from the Dakota County Communications Center received multiple reports of gunshots fired outside the Sonesta Suites in Eagan, Minnesota. Eagan police officers responded to the scene where they observed Maurice Anderson deceased and lying on a grassy boulevard near an entrance to the hotel. The medical examiner later determined that Anderson suffered a total of eleven gunshot wounds. A pink wallet/purse containing $2,200 was located a short distance from the body. Officers found sixteen .40 caliber shell casings: four in the road, two in the grass immediately next to the road, and the remainder scattered about the grassy area where the body was found.

While enroute to the hotel, officers observed a Dodge Charger stopped at a red light at Eagandale Boulevard—the sole egress from the hotel. Officers conducted a traffic stop and encountered appellant Robert Lee Baker, III, and his girlfriend. Officers searched the

Dodge Charger and found various items including an empty BB gun underneath the driver's seat, a Play Station 4 video-game console on the backseat, and a .40 caliber Glock handgun in a backpack on the backseat. There was one bullet left in the chamber of the Glock handgun and nine bullets in its 15-bullet-capacity magazine.

Baker was later charged with second-degree intentional murder in violation of Minn. Stat. § 609.19, subd. 1 (2020), and unlawful possession of a firearm in violation of Minn. Stat. § 624.713, subd. 2 (2020). Baker pleaded guilty to unlawful possession of a firearm and proceeded to a jury trial on second-degree murder. Baker's counsel was allowed to reference self-defense in opening statements, but the district court reserved a ruling on whether it would issue the self-defense jury instruction until the close of evidence.

Baker did not testify. The state introduced three recorded statements Baker made to police detectives following the shooting. In his first statement on the night of the shooting, Baker reported he and his girlfriend had traveled to the Hampton Inn in Eagan, where they waited in the parking lot to pick up his girlfriend's friend. Baker, his girlfriend, and the girlfriend's friend were parked and seated inside the car when two men wearing masks suddenly approached and entered the backseat. According to Baker, after jumping in the car, the men told them to drive off. Baker said the men robbed him of his wallet and keys at gunpoint, and then "took off out of the car, and shortly after that I heard some shootings." Baker maintained he did not exit the vehicle during the robbery. When questioned by detectives about blood on his sweatshirt, Baker responded he was unsure of how the blood got there and stated that his girlfriend drove away after the shooting began.

3

Later in the interview, Baker told detectives that two men got into the backseat and put guns to his and his girlfriend's heads. The men robbed them of their possessions, which included a wallet, ID, Play Station 4 video-game console, and $2,700 in cash, and then "walked off." After that, Baker said he "got out of the car and kind of chased them . . . and gunfire was exchanged." Baker admitted he was in possession of a gun when he exited the car. Baker said he chased the men and told them, "Give me my s--t back." Anderson then raised a gun and pointed it at Baker, and Baker began shooting. Detectives asked Baker how many people he exchanged gunfire with, and Baker responded, "I seen the two and one person took off running." Baker was unsure how many times he fired, but said he stopped shooting when he saw "the guy go down." Baker stated, "I seen the guy go down. Then I got in the car and we pulled off. We pulled back to the hotel. Her friend got out the car, went upstairs." Baker said he placed his gun inside the backpack in the back seat of the car.

In a second statement, made a day after the shooting, Baker told detectives that Anderson and two other men forced his girlfriend to drive from the Hampton Inn and park in the middle of the road (the Hampton Inn shares this road with the Sonesta Suites). Baker said that after robbing them at gunpoint, the robbers exited the car and Anderson approached Baker's girlfriend at the front driver's side window. Baker said Anderson demanded the car keys, but he and his girlfriend pleaded with him, "Come on you can't leave us out here . . . you already took everything." Immediately after this exchange, Baker says Anderson handed off the stolen goods to one of his accomplices and began to "walk

away." Baker reported Anderson then walked from the front driver's side window around to the front of the vehicle.

Baker told detectives this was when he got out of the car with his gun in his hand and said, "Give me my s--t back." According to Baker, Anderson then pointed a gun at him. Baker estimated he was standing "maybe 7 feet" from the car and that Anderson was standing "maybe 30 feet" away from him. Baker told detectives Anderson had "got away for a second" when Baker started firing the .40 caliber. Baker reported, "I wanted to make sure [Baker's girlfriend] was away, they was away from her side . . . of the car, know what I'm saying? In case they start shooting back." Baker said the man who took off running was in possession of a "high point" during the robbery. Once Anderson fell to the ground, Baker said he grabbed his girlfriend's phone (which was lying next to Anderson), grabbed Anderson's gun, and then he ran back to the car. Baker said he put Anderson's gun (the BB gun) in the backseat of the Dodge Charger.

On November 11, 2020, detectives spoke with Baker a third time. Baker confirmed he was standing approximately 30 feet from Anderson just prior to the shooting. Roughly 45 seconds after he got out of the car and said, "Give me my s--t back," the assailants raised their guns, and Baker started shooting. Baker said he continued firing his weapon "standing still," but once he could no longer see Anderson, he "took off running and was still firing." Baker said he did not stop shooting until he was two to three feet away from Anderson and Anderson had fallen to the ground.

In addition to the three recorded statements, the state introduced voluminous recordings of phone calls made from jail by Baker to his mother and to his girlfriend who was with him during the robbery.

The state's witnesses testified that the BB gun found under the seat of the Dodge Charger looked and operated like an authentic handgun. The state also presented expert testimony from assistant medical examiner, Dr. Christopher Liverman, who conducted the autopsy of Anderson. Dr. Liverman testified he could not determine the order of or distance from which the shots were fired, or Anderson's position when he was hit by the bullets.

Prior to closing arguments, counsel again requested the self-defense instruction. The state objected on the ground Baker did not meet his burden of production for the fourth element of self-defense: the absence of a reasonable probability of retreat. Defense counsel filed a letter with the district court identifying the evidence supporting the self-defense instruction, and then moved for the district court to reconsider its ruling. The district court denied the request and also told the jury, "The defense of self-defense is not available to defendant and shall not be considered."

The jury found Baker guilty of second-degree intentional murder, and the district court sentenced him to 438 months in prison. This appeal follows.

## DECISION

A criminal defendant has the right to a meaningful opportunity to present a complete defense. *State v. Pentaky*, 708 N.W.2d 185, 201 (Minn. 2006) (citing *State v. Profit*, 591 N.W.2d 451, 463 (Minn. 1999)). This means that the defendant has the right to present the defendant's version of the facts through witness testimony. *State v. Richardson*, 670

N.W.2d 267, 277 (Minn. 2003) (citing *State v. Richards*, 495 N.W.2d 187, 194 (Minn. 1992)). "It is an abuse of the district court's discretion to refuse to give an instruction on the defendant's theory of the case if there is evidence to support it." *State v. Johnson*, 719 N.W.2d 619, 629 (Minn. 2006) (quotation omitted).

The use of reasonable force against another is permitted under Minnesota law while "resisting or aiding another to resist an offense against the person" or "when used by any person in lawful possession of real or personal property, or by another assisting the person in lawful possession, in resisting a trespass upon or other unlawful interference with such property[.]" Minn. Stat. § 609.06, subd. 1(3), (4) (2020). Deadly force is not authorized under section 609.06, except when necessary to resist or prevent an offense which the actor reasonably believes exposes the actor or another to great bodily harm or death. Minn. Stat. § 609.065, subd. 1 (2020).

To receive a self-defense jury instruction, a defendant must offer sufficient proof of: (1) the absence of aggression or provocation, (2) an actual and honest belief that he was in imminent danger of death or great bodily harm, (3) the existence of reasonable grounds for that belief, and (4) the absence of a reasonable possibility of retreat to avoid the danger. *Johnson*, 719 N.W.2d at 629 (quoting *State v. Basting*, 572 N.W.2d 281, 285 (Minn. 1997)). The defendant bears the burden of producing evidence to support a claim of self-defense. *Id*. The claim of self-defense is sufficiently raised when a defendant creates a reasonable doubt as to whether the level of force was justified. *State v. Soukup*, 656 N.W.2d 424, 429 (Minn. App. 2003), *rev. denied* (Minn. Apr. 29, 2003). If the defendant meets that

burden, then the state must disprove one or more of the self-defense elements beyond a reasonable doubt. *Id.*

Without finding that Baker produced sufficient evidence to create a reasonable doubt as to whether the level of force was justified, the district court found instead that the state had successfully disproved two of the other elements. The district court agreed that Baker submitted sufficient evidence to demonstrate an actual and honest belief that he was in imminent danger of death or great bodily harm, and that he had reasonable grounds for that belief. However, the district court determined Baker's evidence was insufficient to establish either the absence of aggression or provocation, or the absence of a reasonable possibility of retreat to avoid the danger.

We note that the application of the concepts relied upon by the district court—the absence of aggression and the duty to retreat—is complex and somewhat muddled under the facts of this case. First, there is no dispute that Baker voluntarily reengaged with the robbers as they were walking away, in an effort to recover the taken property, and so the argument could be made that Baker's actions constituted the initial aggression or provocation for the encounter that resulted in Anderson's death. But at the same time, we note that Baker may have been justified in using reasonable force "in resisting a trespass upon or other unlawful interference with" the property that had just moments before been taken. *See* Minn. § 609.06, subd. 1(4) (2020). Thus, if Baker initially used reasonable force in attempting to retake the property, such as by stating "Give me my s--t back," it is not certain that he was then unjustified in using deadly force when, in response to his inquiry, Anderson raised his gun at him.

8

Second, although Baker unquestionably had a "duty to retreat and avoid danger if reasonably possible," *State v. Edwards*, 717 N.W.2d 405, 413 (Minn. 2006), it is similarly unclear whether any possibility of retreat was reasonable once Anderson raised his gun and presented an imminent threat of death. Baker was outside of the vehicle and otherwise unprotected at the time, while his girlfriend remained in the driver's seat of the vehicle. Under these circumstances, Baker had very few options for avoiding harm without the use of force at that moment. He could have either (1) run away, hoping not to be shot from behind and leaving his girlfriend to her own fate; or (2) attempted to enter the car and have his girlfriend drive away, a choice which would consume a material amount of time during which he and his girlfriend would continue to be exposed to risk from Anderson's gun. Whether or not these options were sufficiently reasonable so as to preclude a self-defense instruction is not clear in these unusual circumstances.

We need not resolve these questions, however, because we conclude that Baker failed to meet his burden of presenting evidence sufficient to create a reasonable doubt as to the reasonableness of his use of force, and so the district court properly denied his request for a self-defense instruction. *See Soukup*, 656 N.W.2d at 429.

"In evaluating whether a rational basis exists in the evidence for a jury instruction, the evidence is viewed in the light most favorable to the party requesting the instruction." *Edwards*, 717 N.W.2d at 410. The record shows Baker started shooting at Anderson when Anderson was standing 30 feet away from him. Baker fired 16 rounds at Anderson. The autopsy report found that Anderson was struck eleven times. Eight bullets struck Anderson in the back of his body. Afterwards, Baker told law enforcement that the robbers "got away

9

for a second," and that "they took off running, and I chased after them." And he acknowledged to police that Anderson was still running away when Baker was shooting at him and Anderson fell down. Moreover, in recorded phone calls with his girlfriend, Baker told her he was "mad as hell the other n---- got away," and describes how Anderson was still running even after being struck by the gunfire.

By his own admission, Baker was not content with simply neutralizing Anderson's threat, but was motivated by vengeance as demonstrated by his statement that he chased Anderson down while shooting him eleven times—eight in the back—and his expressed disappointment that he was not able to shoot the other robber as well. These circumstances, on which the district court relied in finding that Baker had not demonstrated the absence of a reasonable possibility of retreat, equally support the conclusion that his use of deadly force was unreasonable. Indeed, we conclude that no reasonable jury could find that Baker "used only the level of force reasonably necessary to prevent the harm feared" because the threat of death or great bodily harm was extinguished once Anderson began to flee. *State v. Glowacki*, 630 N.W.2d 392, 399 (Minn. 2001). The district court therefore did not abuse its discretion by not instructing the jury on the law of self-defense or defense of others.[1]

**Affirmed.**

---

[1] We do not, by this opinion, hold that the victim of an armed robbery does not have the right to attempt to recover stolen property or to make a citizen's arrest pursuant to Minnesota Statutes sections 629.37, subdivision 3, 629.38, and 629.39 (2020). A victim may pursue an armed robber to recover stolen property, particularly when the armed robbery remains in progress; the "getaway" or escape of the robbers is not an event occurring after the robbery but is a part of the robbery itself. *U.S. v. Pate*, 932 F.2d 736, 738 (8th Cir. 1991) (quotations omitted).

**JOHNSON**, Judge (concurring specially)

I would affirm the conviction on the ground that the district court did not abuse its discretion by refusing to give the requested instruction for the reasons stated by the district court. Baker could have safely driven away from the scene and avoided further conflict. Instead Baker chased Anderson, whom Baker knew was armed, thereby creating a new confrontation. Baker has not cited any caselaw compelling the conclusion that the district court erred. Therefore, I concur in the result.