**STATE of Minnesota, Respondent,**

v.

**Lorenzo DORSEY, Appellant.**

**No. C6–03–197.**

Supreme Court of Minnesota.

Aug. 4, 2005.

Office of the Minnesota State Public Defender, Theodora Gaïtas, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, State Attorney General, St. Paul, MN, Amy J. Klobuchar, Hennepin County Attorney, Linda M. Treyer, Ass't County Attorney, Jean E. Burdorf, Ass't County Attorney, Minneapolis, MN, for Respondent.

OPINION

ANDERSON, PAUL H., Justice.

Appellant Lorenzo Dorsey was arrested and charged with felony possession of marijuana, a fifth-degree controlled substance crime. Dorsey admitted to possession of the marijuana, and faced a presumptive probationary sentence on that charge. The state alleged that Dorsey possessed a firearm in conjunction with the marijuana and sought to impose a mandatory three-year minimum prison sentence. Dorsey disputed the claim that the firearm found near the marijuana belonged to him and a bench trial was held in Hennepin County District Court to determine whether the gun was Dorsey's. The district court judge found that Dorsey was in constructive possession of a firearm when the marijuana was seized, convicted him, and sentenced him to three years in prison. Dorsey appealed his conviction to the Minnesota Court of Appeals, arguing that the district court judge who presided over his bench trial had personal knowledge of a disputed evidentiary fact and therefore should have disqualified herself. Dorsey also asserted that the judge's independent investigation of a defense witness's factual assertion denied him a fair trial before an impartial judge and finder of fact. The court of appeals affirmed. We reverse.

In November 1999, Minneapolis police obtained a search warrant for appellant Lorenzo Dorsey's north Minneapolis home. During their search, the police found both marijuana and a handgun. Approximately ten months after the search, the police arrested Dorsey and charged him with felony possession of marijuana under Minn.Stat. § 152.025, subd. 2(1) (2004).

The state also sought to impose a three-year mandatory minimum prison sentence under Minn.Stat. § 609.11, subd. 5(a) (2004), for Dorsey's possession of a firearm in connection with his possession of drugs. Dorsey stipulated that the marijuana seized by the police was his, but disputed the state's claim that the gun found in his home belonged to him. After Dorsey waived his right to a jury trial, a bench trial was held to determine whether the gun was Dorsey's.

Dorsey's trial began at approximately 2:05 p.m. on April 12, 2002, and the state's only witness was Officer Daniel Ungurian, who testified to the facts surrounding the search and seizure. Ungurian testified that the police obtained a knock and announce search warrant for narcotics at Dorsey's home after confirming a controlled purchase of crack cocaine at the home. According to Ungurian, when the police approached Dorsey's front door, they observed through a window that people inside the home were "running away" from the door. The police then used a ram to open the door, secured the residence, and conducted a search. At the time of the search, there were "at least" eight adults in the home and "a number" of small children. While the police searched Dorsey's home, Dorsey told one of the police officers that everything in the home belonged to him. As a result of the search, the police found approximately 600 grams of marijuana in a safe in the kitchen.

Ungurian testified that after the police found the marijuana, he interviewed Dorsey on tape and asked him whether there were any weapons in the home. Dorsey told Ungurian that he owned a 9–millime-ter handgun and that, although there were bullets in the magazine, the magazine was not "locked in." The police searched for the gun for approximately one-half hour without success. Ungurian then pressed Dorsey to reveal the gun's location, pointing out that the gun posed a safety threat because there were children in the home. According to Ungurian, Dorsey told him that the gun was hidden between the cushions of a black leather couch in the living room. The police searched the couch and found a 9–millimeter handgun with a detached, loaded magazine close by. The couch was located four or five feet away from where the police found the marijuana. Following Ungurian's testimony, the state rested its case.

At about 3:30 p.m., Dorsey called Pearl Worthy as his first defense witness. Worthy stated that she was 19 years old, that Dorsey and his wife were her friends, and that she called them "papa" and "mama." Worthy testified that in November 1999, shortly before Dorsey's home was searched, she sold Dorsey's wife two black leather couches. According to Worthy, she took the couches from the home of her deceased boyfriend, LaTerrance Paige.[1] She stated that Paige was a drug dealer who had died in a drug-related shooting in May 1999. Worthy also testified that she had seen Paige "stuff" guns in the couch and thought the gun the police found in Dorsey's couch "could have been" Paige's.

On cross-examination, Worthy admitted she had dated Paige very briefly, that she did not know his date of birth, and that before he died she had known him only by the name of "Duck." The following exchange then took place:

---

1. In their briefs, Dorsey and the state spell Paige's first name "LaTerrance," as did the court of appeals. We note, however, that we spelled Paige's first name "LeTerrance" in *State v. Fields,* 679 N.W.2d 341 (Minn.2004) (affirming Victor Fields' conviction for the first-degree murder of Paige).

State: Do you [Worthy] know anybody in Mr. Paige's family?

Worthy: No.

Defense: I'm going to object to this continuing line of cross-examination as irrelevant, Your Honor.

State: If I can make an Offer of Proof?

Judge: Sure.

State: I think it goes to the issue of her credibility, her story as to where the couch came from. As to whether or not there was in fact somebody named LaTerrance Paige that died at that particular period of time. It is something that can be searched out. Something that can be investigated through papers and elsewhere and if—if he died before the couch—his couch was supposedly sold to these people, it certainly corroborates what she says. If that isn't in fact the case, then it goes to her credibility.

To tell you the truth, judge, I really don't have any other questions along these lines.

Judge: Well, I actually am aware of a LaTerrance Paige who was a Defendant with frequent appearances in drug court. I believe he died.

State: Yes?

Judge: However, I don't believe it was—I think it was more recent than 1999. So, obviously, I don't know if that is the same LaTerrance Paige. But it is a somewhat unusual name. And, you know, I'm not sure where that leaves us. I actually—if it's that LaTerrance Paige, then the timing would not fit. I don't know how many LaTerrance Paiges were shot on drug-related incidents in the city of Minneapolis over the last three years. I would guess there weren't two.

Following this exchange, the judge allowed the state to continue its cross-examination of Worthy, explaining:

Miss Worthy acknowledged that she didn't know Mr. Paige very well. I guess if there's any other information Miss Worthy could provide that would make it—would clarify which LaTerrance Paige we are talking about, I'll permit you to explore that a bit longer.

Worthy then testified that she had dated Paige for about two months and that he regularly slept at a "drug house" in north Minneapolis where she went to see him. She stated that she learned of Paige's death on the television news, did not know any members of Paige's family, and did not attend Paige's funeral. According to Worthy, after Paige died in May 1999, she and her friend, Ava Garrett, went to Paige's north Minneapolis house where Paige regularly slept and took two black leather couches, which Garrett put into storage until she arranged to sell them to Dorsey's wife in November 1999. Worthy testified that Garrett gave her $120 as a result of this sale.

Worthy's testimony ended around 4 p.m. Before Worthy left the witness stand, the judge asked her to confirm the spelling of Paige's last name. Worthy then stepped down and the judge and counsel discussed various logistical matters regarding the trial. During this discussion, the judge made the following statement:

I'm not trying to play junior detective. I didn't want to have in my mind something, so I asked [my clerk] to check. This is LaTerrance Paige's read-out. He died December of 2000.[2] Again, I'm

**2.** The judge apparently misspoke, as records indicate that Paige actually died in December 2001. The judge later took judicial notice of December 6, 2001, as the date of death of a man named LaTerrance Paige.

not trying to inject myself here as the investigator. But, obviously, I spent—I knew LaTerrance Paige pretty well from drug court, not—as one would in drug court. It was my recollection that he died fairly recently.

So when I was listening I thought, well, I better check this out because a lot of people die in drug court. So, anyway, for whatever it's worth I thought you should know what I know.

The state then replied, "I know that. I found that out over the noon hour." The trial was then adjourned for three days.

While the record is not clear, it appears from this exchange that the judge had her clerk look up Paige's date of death while Worthy was testifying, as there was no recess during Worthy's testimony. It also appears that before the trial began ("over the noon hour"), the state had interviewed Worthy and that, as a result of this interview, the state had investigated Paige's date of death and learned he died in December 2001.

When the trial reconvened on April 15, Dorsey testified on his own behalf and asserted that the 9–millimeter handgun he had told the police he owned was actually a .380, "because a 380 is basically like a 9 to me." He stated he had purchased the .380 in Illinois, and that the last time he had seen it was in a safe in his home. He testified that after the police found the marijuana, they told him they needed to locate a "murder weapon," and he helped the police locate the safe where he thought the gun was stored. But the safe was empty. According to Dorsey, he then went to the living room with the police and said to one of the officers, "Why don't you search in the couch?" Dorsey stated the officer replied "I don't want to touch it if it's a gun," before allowing Dorsey—whose hands were handcuffed together in front—to search the sofa. Dorsey said that some-thing went "thump" before he reached in and pulled out a gun with a black handle. Dorsey then stated that the .380 handgun he purchased in Illinois had a silver handle.

After Dorsey finished presenting his case, the state asked the judge to take "judicial notice of its files" reflecting that LaTerrance Paige died on December 6, 2001, which was approximately 31 months after the date of death testified to by Worthy and over 24 months after the search of Dorsey's home. The judge agreed to take judicial notice of Paige's date of death and Dorsey's counsel stated, "[w]e have no objection."

In her written findings of fact and conclusions of law, the judge found that Dorsey's version of the facts, particularly his own testimony, lacked credibility for several reasons. First, the judge did not believe Dorsey's testimony that police officers came into his home and asked about a "murder weapon" because it was undisputed that the officers were searching for narcotics. Second, the judge found Dorsey's testimony regarding the circumstances surrounding the discovery of the gun to be "particularly incredible." On this point, the judge found it "unbelievable" and contrary to police practice that the officers handcuffed Dorsey, then asked him to reach into the sofa to retrieve a gun. Additionally, the judge noted that although Dorsey had told the police in a taped interview that he owned a "9"—like the gun found in the couch—he claimed at trial that the only gun he owned was actually a .380, and that he only referred to the gun as a "9."

The judge also found that Worthy's testimony lacked credibility for two specific reasons. First, the judge stated that Worthy was not credible because she could not provide any specific information on the whereabouts of her friend, Ava Garrett,

whom she testified had facilitated the sale of the two black leather couches to Dorsey's wife. Second, the judge found that Worthy lacked credibility because court records indicated that a man named La-Terrance Paige was shot and killed in December 2001, far later than the date given by Worthy. In making this finding, the judge noted that no evidence was presented showing the existence of another La-Terrance Paige who died in May 1999.

Based on these findings, the judge found that Dorsey was in constructive possession of the 9-millimeter handgun found by the police. The judge convicted Dorsey of felony possession of marijuana while in possession of a firearm and sentenced him under Minn.Stat. § 609.11, subd. 5(a), to three years in prison—the mandatory minimum sentence for possession of a firearm in conjunction with drugs.

Dorsey appealed his conviction, arguing to the court of appeals that he was denied a fair trial before an impartial judge and finder of fact. The court of appeals affirmed Dorsey's conviction in an unpublished opinion. *State v. Dorsey*, No. C6–03–197, 2003 WL 22777501 (Minn.App. Nov.25, 2003). The court of appeals analyzed Dorsey's claims under the Code of Judicial Conduct and concluded that under the code the judge had "acted appropriately in telling the parties that she was aware of certain facts that impaired Worthy's credibility" because, had she not done so, "the judge probably would have unfairly discredited Worthy and perhaps erroneously convicted Dorsey." *Id.* at *3. The court of appeals also concluded that, once the judge made her disclosure, the burden was upon defense counsel to ask the judge to disqualify herself. *Id.* As for the judge's investigation into the date of Paige's death, the court of appeals concluded that, although "a close call," the judge's investigation was error under the

code because the investigation caused the judge to interject herself into the evidence-gathering process and created the appearance of impropriety. *Id.* Nevertheless, the court of appeals held that the judge's investigation was harmless error. *Id.* We granted Dorsey's petition for review.

## I.

On appeal, Dorsey asserts that he is entitled to a new trial because the judge was barred from presiding over his trial under Minn. R.Crim. P. 26.03, subd. 13(3), which provides that "[n]o judge shall preside over a trial or other proceeding if that judge is disqualified under the Code of Judicial Conduct." Dorsey argues that the judge was disqualified under Canon 3D(1)(a) of Minnesota's Code of Judicial Conduct because she had "personal knowledge of disputed evidentiary facts concerning the proceeding." Dorsey also argues that he is entitled to a new trial because the judge's conduct during his trial deprived him of his constitutional right to a fair trial before an impartial finder of fact.

This case presents a number of questions of first impression for our court. First, we consider whether a district court judge who has acquired knowledge that is relevant to the proceeding at hand is barred from presiding over a case under Minn. R.Crim. P. 26.03, subd. 13(3). We then must decide whether a defendant's right to due process is violated when a judge in a bench trial openly questions the veracity of a factual assertion made by a witness for the defense, independently investigates that fact, and reveals the results of her investigation to counsel. Finally, in the event that error occurred, we must determine whether the defendant is entitled to a new trial.

We first turn to the question of whether, under Minn. R.Crim. P. 26.03, subd. 13(3), the judge was precluded from presiding

over Dorsey's trial because she was disqualified under Minnesota's Code of Judicial Conduct based on her knowledge of the approximate date of Paige's death.[3] In answering this question, our focus is on the point in time when the judge realized that she had knowledge relevant to the proceedings at hand. According to Dorsey, once the judge realized that her memory of the approximate date of Paige's death conflicted with the date given by Worthy, the judge was obligated to disqualify herself under Canon 3D(1)(a) because she had "personal knowledge of disputed evidentiary facts."

■ Whether a judge has violated the Code of Judicial Conduct is a question of law, which we review de novo. *See Powell v. Anderson*, 660 N.W.2d 107, 114, 119 (Minn.2003). Canon 3D(1)(a) of the code states:

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding.

We have not previously construed the phrase "personal knowledge" as it is used in Canon 3D(1)(a).

*Canon 3D(1)(a)*

■ It is unclear from the record precisely how the judge learned of the approximate date of Paige's death. She may have acquired the knowledge through court-related proceedings, but she also may have learned of Paige's death from another public source, such as a newspaper article or a television news story. There is no suggestion, however, that the judge's knowledge of Paige's approximate date of death arose from any individual connection to Paige or the specific circumstances surrounding his death.

Dorsey argues that the phrase "personal knowledge" in Canon 3D(1)(a) includes *all* knowledge acquired by a judge outside of formal judicial proceedings. Accordingly, under Dorsey's definition, if the judge learned of the approximate date of Paige's death in a formal judicial proceeding, she would not be obligated to disqualify herself under the canon. On the other hand, under Dorsey's definition, if the judge's knowledge came about in her general judicial capacity or by reading the newspaper or watching the local news, she *would* have an obligation to disqualify herself.

We decline to adopt Dorsey's expansive definition of "personal knowledge." As a practical matter, judges, in their lives as members of the judiciary and as citizens, are routinely exposed to a wide range of information that may be relevant to a factual dispute in a proceeding over which they eventually preside. The code man-

---

**3.** The dissent asserts that it is unnecessary for us to address Dorsey's argument that the judge was obligated to disqualify herself under the canon because we have concluded that Dorsey is entitled to a new trial under the Constitution. We disagree. The court of appeals' decision addressed Dorsey's claim exclusively in terms of the code. Because our analysis of the code differs from the analysis of the court of appeals, we conclude this issue requires clarification. While we ultimately hold that the judge's independent investiga-

tion in this case deprived Dorsey of an impartial judge, it is important that we do not let stand any possible suggestion that the judge was required to disqualify herself under the canon at the point in time when she first realized that she knew the approximate date of Paige's death. If we were to remain silent regarding the code, as the dissent recommends, it would likely result in confusion in the district courts and risk unwarranted challenges under the code to judges' ability to preside over court proceedings.

dates that a judge *must* disqualify herself if she has "personal knowledge" of disputed evidentiary facts. If we were to interpret the word "personal" to include *all* knowledge a judge acquires outside of formal judicial proceedings, our judiciary would founder under the day-to-day weight of motions aimed at disqualifying judges who have acquired general, passing knowledge of disputed evidentiary facts in the course of their lives as judges and citizens.

Our judicial system presumes that judges are capable of setting aside collateral knowledge they possess and are able to "approach every aspect of each case with a neutral and objective disposition." *Liteky v. United States,* 510 U.S. 540, 561–62, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) (Kennedy, J., concurring). Further, the "acquired skill and capacity to disregard extraneous matters is one of the requisites of judicial office," as judges are expected to make decisions based solely on the merits of cases before them. *Id.* at 562, 114 S.Ct. 1147 (Kennedy, J., concurring); *see also Lee v. State,* 735 N.E.2d 1169, 1172 (Ind.2000) (stating "the law presumes that a judge is unbiased and unprejudiced in the matters before him").

■ Given the expectation that judges will set aside "extraneous matters" and decide cases on their merits, we conclude that the requirement that a judge must disqualify herself if she has "personal knowledge of disputed evidentiary facts" is a narrow prohibition, and that the word "personal" should be interpreted according to its common usage. "Personal" is primarily defined as "of, relating to, or affecting a person," and is regarded as synonymous with "private." *Webster's Ninth*

*New Collegiate Dictionary* 877 (1987). "Private," in turn, is defined as "restricted to the individual or arising independently of others." *Id.* at 936. For the purposes of Canon 3D(1)(a), "personal knowledge" pertains to knowledge that arises out of a judge's private, individual connection to particular facts. We conclude that it does not include the vast realm of general knowledge that a judge acquires in her day-to-day life as a judge and citizen.[4]

In this case, Dorsey has not demonstrated that the judge's knowledge of Paige's approximate date of death arose from any private, individual connection to Paige or the specific circumstances surrounding his death. Rather, her knowledge apparently arose in the course of her general judicial capacity or as a result of her day-to-day life as a citizen taking an interest in local news. Because the judge's knowledge did not arise out of a private, individual connection to Paige, we conclude that under the canon the judge did not have "personal knowledge of disputed evidentiary facts." Accordingly, we conclude that at the point in time when the judge realized she possessed knowledge relevant to determining whether Dorsey was guilty, she had no obligation under Canon 3(D)(1)(a) to disqualify herself.

*Canon 3D(1)*

■ Even though we have concluded that the judge's knowledge of Paige's date of death was not "personal" under Canon 3D(1)(a), the question remains whether the judge nonetheless had an obligation to disqualify herself under the general language of Canon 3D(1), which provides that a judge must disqualify herself in a proceed-

---

4. The dissent misreads our analysis in stating that "general judicial capacity [ ] is determinative." General judicial source is *not* determinative under our analysis—whether the judge's knowledge arises from a "private, individual connection" to the facts in question *is.*

ing in which her impartiality "might reasonably be questioned."

■ In *Liteky*, the United States Supreme Court stated that the prohibition against a judge presiding over a case in which the judge has "personal bias" concerning a party cannot be sensibly interpreted to mean that a judge with *"judicial* bias" *can* preside over a case:

> Bias and prejudice seem to us not divided into the "personal" kind, which is offensive, and the official kind, which is perfectly all right. * * * *. [I]nterpreting the term "personal" to create a complete dichotomy between court-acquired and extrinsically acquired bias produces results so intolerable as to be absurd. Imagine, for example, a lengthy trial in which the presiding judge for the first time learns of an obscure religious sect, and acquires a passionate hatred for all its adherents. This would be "official" rather than "personal" bias, and would provide no basis for the judge's recusing himself.

510 U.S. at 549–50, 114 S.Ct. 1147 (applying 28 U.S.C. § 455(b)(1)). Accordingly, the Court concluded that, although a judge's personal bias is a *sufficient* condition to require disqualification, it is not a "a *necessary* condition for 'bias or prejudice' recusal." *Id.* at 554, 114 S.Ct. 1147. As such, it is possible that a judge with judicially-acquired bias or prejudice concerning a party could be required to recuse herself if the bias or prejudice is such that the judge's impartiality is subject to

reasonable question. *Id.* at 555, 114 S.Ct. 1147.

Although the case at hand does not concern whether the judge has "personal bias" concerning a party, we believe the Supreme Court's reasoning in *Liteky* is relevant to our analysis of the phrase "personal knowledge." [5] That is, although a judge's knowledge of a disputed evidentiary fact may not fall under the narrow definition of "personal" as previously articulated, it is nonetheless possible that a judge's "nonpersonal" knowledge—depending on its source and nature—*could* create a reasonable question regarding the judge's impartiality.

■ The code does not set forth any exceptions to the rule in Canon 3D(1) that a judge must disqualify herself if her impartiality may reasonably be questioned, nor does it "provide a precise formula that can automatically be applied" in making a disqualification determination. *Powell,* 660 N.W.2d at 115. Further, the "grounds for disqualification in Canon 3D(1) are stated broadly, leaving considerable room for interpretation in their application to any given set of circumstances." *Id.* When reviewing a judge's decision not to disqualify herself, we must make an objective examination of whether the judge's impartiality could reasonably be questioned. *Id.* at 116; *see also United States v. Cowden,* 545 F.2d 257, 265 (1st Cir. 1976). As noted earlier, it is presumed that judges will set aside collateral knowl-

---

**5.** The prohibition against judges presiding over cases in which they posses "personal bias" is enumerated in the same subsection as the prohibition against "personal knowledge":

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

a) the judge has a *personal bias* or prejudice concerning a party or a party's lawyer, or *personal knowledge* of disputed evidentiary facts concerning the proceeding.

Minn.Code Judicial Conduct, Canon 3D(1)(a) (emphasis added); *see also* 28 U.S.C. § 455(b)(1) (2000).

edge and approach cases with "a neutral and objective disposition." *Liteky*, 510 U.S. at 562, 114 S.Ct. 1147 (Kennedy, J., concurring). As such, judges are presumed to have the ability to set aside "nonpersonal" knowledge and make decisions based solely on the merits of cases before them. *Lee*, 735 N.E.2d at 1172.

In this case, the judge was obligated to set aside her knowledge of Paige's approximate date of death and—with a neutral and objective disposition—decide the case solely on the merits of the evidence presented by the parties. *Cf. Spinner v. McDermott*, 190 Minn. 390, 392, 251 N.W. 908, 908 (1933). Accordingly, we conclude the judge was not obligated to disqualify herself under Canon 3D(1) at the point in time when she realized that she knew the approximate date of Paige's death.

*Minn. R. Civ. P. 26.03, subd. 13(3)*

Because we have concluded that the judge did not have an obligation to disqualify herself under either Canon 3D(1)(a) or Canon 3D(1) of the Code of Judicial Conduct when she realized she knew the approximate date of Paige's death, we hold that she was not barred under Minn. R.Crim. P. 26.03, subd. 13(3), from continuing to preside over Dorsey's trial.[6]

## II.

 Our determination that the judge who presided at Dorsey's trial had no obligation to disqualify herself under the Code of Judicial Conduct when she realized that she had knowledge relevant to determining the outcome of Dorsey's case does not end our analysis. The question remains whether the judge's subsequent conduct

deprived Dorsey of his right to a fair trial and an impartial finder of fact. This is a constitutional question, and we review a lower court's ruling on such questions de novo. *See State v. Wicklund*, 589 N.W.2d 793, 797 (Minn.1999).

Dorsey asserts he was denied his right to a fair trial and an impartial finder of fact when the judge: (1) openly questioned the veracity of a factual assertion made by Dorsey's key witness; (2) independently investigated the fact; and (3) revealed the results of her investigation in open court.

The Sixth Amendment of the United States Constitution guarantees criminal defendants the right to be tried by an impartial jury. *See also* Minn. Const. art. 1, § 6. Although the right to a trial before an impartial judge is not specifically enumerated in the Constitution, this principle has long been recognized by the United States Supreme Court. *Rose v. Clark*, 478 U.S. 570, 577, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (citing *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927)); *see also Greer v. State*, 673 N.W.2d 151, 155 (Minn.2004) ("[I]mpartiality is the very foundation of the American judicial system."). In *Pederson v. State*, we said, "[t]o maintain public trust and confidence in the judiciary, judges should avoid the appearance of impropriety and should act to assure that parties have no reason to think their case is not being fairly judged." 649 N.W.2d 161, 164–65 (Minn.2002).

 An impartial trial requires that conclusions reached by the trier of fact be based upon the facts in evidence, *Johnson v. Hillstrom*, 37 Minn. 122, 123, 33 N.W. 547, 548 (1887), and prohibits the trier of

---

6. Dorsey also asserts that he is entitled to a new trial because the judge's investigation of Paige's date of death violated the comment to Canon 3(A)(7), which provides that judges are prohibited from independently investigating facts in evidence and "must consider only the

evidence presented." Because we conclude that Dorsey is entitled to a new trial for constitutional reasons related to the judge's investigation, it is unnecessary to address his independent investigation claim under Canon 3(A)(7).

fact from reaching conclusions based on evidence sought or obtained beyond that adduced in court. *Spinner*, 190 Minn. at 392, 251 N.W. at 908. A judge's conduct must be "fair to both sides," and a judge should "refrain from remarks which might injure either of the parties to the litigation." *Hansen v. St. Paul City Ry. Co.*, 231 Minn. 354, 360, 43 N.W.2d 260, 264 (1950).

Here, we are confident that the judge who presided over Dorsey's bench trial was motivated by her desire to seek the truth and be candid about what she knew.[7] But, as Justice Black noted in *Williams v. Florida* and we quoted in *State v. Costello:* "A criminal trial is in part a search for truth. But it is also a system designed to protect 'freedom' by insuring that no one is criminally punished unless the State has first succeeded in the admittedly difficult task of convincing a jury that the defendant is guilty." 646 N.W.2d 204, 213 (Minn.2002) (quoting *Williams v. Florida*, 399 U.S. 78, 113, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) (Black, J., concurring in part and dissenting in part)). Despite the judge's focus on truth-finding and candor in this case, we, for a number of reasons, conclude that the judge's questioning of the veracity of Worthy's testimony and her subsequent investigation deprived Dorsey of an impartial judge and finder of fact.

First, the judge—sitting as the finder of fact—indicated by her comments during Worthy's testimony that she believed, based on facts not in evidence, that Worthy's statements about the date of Paige's death were likely false. These comments disregarded the judge's duty as the finder of fact to make factual determinations sole-

ly on the basis of evidence in the record. *Hillstrom*, 37 Minn. at 123, 33 N.W. at 548; *see also People v. Wallenberg*, 24 Ill.2d 350, 181 N.E.2d 143, 145 (1962) (ordering new trial where judge in bench trial considered facts not admitted into evidence in reaching his conclusion).

Second, the judge independently investigated a fact not introduced into evidence, violating her obligation as the finder of fact to refrain from seeking or obtaining evidence outside that presented by the parties during the trial. In *Price Bros. Co. v. Phila. Gear Co.*, the Sixth Circuit Court of Appeals stated: "Unquestionably, it would be impermissible for a trial judge to deliberately set about gathering facts outside the record of a bench trial over which he was to preside." 629 F.2d 444, 447 (6th Cir.1980). Similarly, in *Smith v. State*, the Maryland Court of Special Appeals ordered a new trial when the judge had his law clerk investigate the defendant's medical history, then rebutted the defendant's testimony by calling his clerk to testify regarding what the clerk's investigation had revealed. 64 Md.App. 625, 498 A.2d 284, 285–86 (1985). The court in *Smith* stated that the judge's actions "turned the judge from an impartial arbiter, bound to decide the case on the facts presented in open court, into an investigator for the prosecution. * * * This eliminated any vestige of impartiality." *Id.* at 288. In the case before us, the judge was not only the referee of the proceeding, she was also the finder of fact. As such, her independent investigation of a fact testified to by a defense witness was impermissible.

The dissent asserts that the judge's verification of Paige's date of death "was more

---

**7.** We acknowledge that—as an appellate court—we have the advantage of evaluating a static, unchanging record in determining how a circumstance like the one at hand should have been handled. Our analysis is therefore mindful of the dynamic circumstances in which district court judges must make decisions, and is not intended to be critical of the judge's decision in this case.

akin to a confirmatory follow-up of an immutable fact and not an independent investigation," but the dissent fails to cite any cases in which other courts have applied such a principle. Moreover, the cases cited by the dissent uniformly stand for the proposition that, when judges seek information outside of the record, it constitutes an impermissible independent investigation. We believe that adopting the dissent's position opens a judicial Pandora's box regarding if, when, and how a judge sitting as the finder of fact may conduct independent investigations meant to "confirm" a judge's extra-record knowledge of "immutable" facts relevant to the disposition of a case.

Criminal bench trials are held every day in which testimony regarding "immutable facts" is presented. Under the dissent's position, as long as a witness is testifying to an immutable fact, judges are free to rely on extra-record knowledge regarding that fact's veracity, and—when judges are unsure if their memory of the fact is accurate—engage in a "confirmatory follow-up" to confirm their hunches. Characterizing what the judge in this case did as "a confirmatory follow-up to candid disclosure of extra-record knowledge regarding a frequent drug-court defendant" cannot and does not hide the fact that the judge conducted an independent investigation. We believe the dissent's characterization of the judge's actions would establish dangerous precedent and separate our court from most other jurisdictions.

■ We conclude that preserving the bright-line rule that judges may not engage in independent investigations of facts in evidence—regardless of whether the evidence and investigation involve immutable facts—is the better rule. Although the dissent's position may result in a less distasteful outcome in the case at hand, we believe it would permanently compromise the bedrock principle in our criminal justice system that judges may not investigate or rely upon extra-record knowledge when sitting as the finder of fact. *See* Leslie W. Abramson, *The Judicial Ethics of Ex Parte and Other Communications*, 37 Hous. L.Rev. 1343, 1366–69 (2000) (quoting Chief Justice Benjamin Cardozo's statements in *In re Richardson*, 247 N.Y. 401, 160 N.E. 655, 658 (1928) that the function of judges " 'is to determine controversies . . . .' They are not adjuncts or advisers, much less investigating instrumentalities. . . . The judge is [not] a prosecutor. . . . He is [not] to follow trails of suspicion, to uncover hidden wrongs, to build up a case as a prosecutor builds one. . . . [H]is conclusion is [not] to be announced upon a case developed by himself.").

■ The third reason supporting our conclusion that the judge was not impartial involves the judge's announcement of the results of her investigation to counsel, which effectively introduced into the proceedings a material fact that was favorable to the state—and which the state had not yet introduced. We disagree with the dissent's assertion that the judge's disclosure "fulfilled her obligation for candor" because it revealed information to the parties "she believed might have a bearing on her ability to remain impartial." The dissent's position fails to recognize that the judge's disclosure served to directly impeach the veracity of a defense witness's testimony. Although we recognize that the comment to Canon 3D(1) provides that a judge "should disclose on the record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification," this comment must be reconciled with the long-standing principle that a judge's conduct must be "fair to both sides" and a judge must "refrain from remarks which might injure

either of the parties to the litigation." *St. Paul City Ry. Co.*, 231 Minn. at 360, 43 N.W.2d at 264. In *St. Paul City Railway*, we further noted that "[t]o assume a partisan position is to desert the high position to which the judge is elevated, and assume the role of the advocate." *Id.* (quoting *Koontz v. State*, 10 Okla.Crim. 553, 139 P. 842, 845 (1914)). Accordingly, we conclude that, when a judge possesses extra-record knowledge that is prejudicial to a defendant in a criminal trial, the judge may not disclose that knowledge. Rather, the judge must either disqualify herself or set the knowledge aside and consider only the evidence adduced in deciding the case.

We now turn to the question of whether the judge's conduct entitles Dorsey to a new trial. Dorsey argues that, because the judge's conduct deprived him of an impartial judge and finder of fact, the judge's alleged impartiality was a "structural defect" under *Arizona v. Fulminante*, 499 U.S. 279, 309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), and therefore requires automatic reversal. The state counters that Dorsey is not entitled to relief, as "the alleged error did not affect [Dorsey's] substantial rights or the integrity and fairness of the judicial proceeding."

■ A criminal defendant has a constitutional right to a fair trial before a judge who has "no actual bias against the defendant or interest in the outcome of his particular case." *McKenzie v. State*, 583 N.W.2d 744, 747 (Minn.1998) (quoting *Bracy v. Gramley*, 520 U.S. 899, 905, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997)). The Supreme Court has recognized that this minimal due process requirement establishes only a "floor, not a uniform standard" of what is required for a "fair trial in a fair tribunal" before a qualified judge. *Bracy*, 520 U.S. at 904, 117 S.Ct. 1793.

■ In Minnesota, we have long recognized that a criminal defendant has a fundamental right to a fair trial before an impartial judge beyond the requirement that a judge not have actual bias. *See State v. Mims*, 306 Minn. 159, 168, 235 N.W.2d 381, 387 (1975). We have, however, stated that "[n]ot every judicial error automatically requires reversal," and agreed with the Supreme Court that "most constitutional errors can be harmless." *State v. Shoen*, 598 N.W.2d 370, 375 (Minn. 1999) (quoting *Fulminante*, 499 U.S. at 306, 111 S.Ct. 1246). In *Fulminante*, the Court stated that errors violating constitutional rights can be divided into two categories: "trial errors" and "structural defects." 499 U.S. at 309, 111 S.Ct. 1246. Trial errors occur during the presentation of the case to the jury, and "may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Id.* at 307–08, 111 S.Ct. 1246. In cases involving trial errors, we apply a harmless error test, which requires reversal unless the guilty verdict rendered is "surely unattributable" to the error. *Shoen*, 598 N.W.2d at 377.

■ In contrast, structural errors are "defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Fulminante*, 499 U.S. at 309, 111 S.Ct. 1246. In *Fulminante*, the Supreme Court gave two examples of structural errors: the deprivation to the right of counsel at trial and the presence of a partial judge. *Id.* at 309, 111 S.Ct. 1246 (citing *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); and *Tumey*, 273 U.S. at 510, 47 S.Ct. 437). The Court stated in *Fulminante* that "[t]he entire conduct of the trial from beginning to end is obviously affected by the absence of counsel for a criminal defendant, just as it is by the presence on the bench of a judge who is not impartial." *Id.* at 309–10, 111 S.Ct. 1246; *see also*

*Gray v. Mississippi,* 481 U.S. 648, 668, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987) ("We have recognized that some constitutional rights are so basic to a fair trial that their infraction can never be treated as harmless error. The right to an impartial adjudicator, be it judge or jury, is such a right." (quotation and citation omitted)). Structural errors require reversal, for without the basic protections of the right to counsel and the right to an impartial judge, "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Fulminante,* 499 U.S. at 310, 111 S.Ct. 1246 (citing *Rose v. Clark,* 478 U.S. at 577–78, 106 S.Ct. 3101). Accordingly, when a defendant has been deprived of an impartial judge, automatic reversal is required.

Sitting as the finder of fact, the judge in this case, after openly questioning the veracity of a factual assertion made by a key defense witness, independently investigated that fact and then reported the results of her investigation to counsel. In *Rose v. Clark,* the Supreme Court stated:

[S]ome constitutional errors require reversal without regard to the evidence in the particular case. This limitation recognizes that some errors necessarily render a trial fundamentally unfair. The State of course must provide a trial before an impartial judge, with counsel to help the accused defend against the State's charge. Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair. Harmless-error analysis thus presupposes a trial, at which the defendant, represented by counsel may present evidence and argument before an impartial judge and jury.

478 U.S. at 577–78, 106 S.Ct. 3101 (citations omitted). We conclude that Dorsey was deprived of the "basic protection" of an impartial judge and finder of fact when the judge independently investigated a factual assertion made by a key defense witness and revealed the results of her investigation to counsel. This deprivation constituted a structural error, which precludes harmless-error analysis and requires that we reverse "without regard to the evidence in [Dorsey's] particular case." *Id.; see also Fulminante,* 499 U.S. at 309, 111 S.Ct. 1246. At this point, we stress that it was the judge's conduct in this case—and not the fact that she knew Paige's approximate date of death—that deprived Dorsey of a fair trial and an impartial finder of fact. Had the judge set aside her knowledge and decided the case based on the merits of the evidence the parties presented, Dorsey would have no basis to assert he was denied a fair trial. But the judge's investigation as a result of that knowledge during Dorsey's trial has caused us to hold that Dorsey did not receive a fair trial before an impartial finder of fact. Accordingly, we reverse and remand for a new trial.

Reversed and remanded.

ANDERSON, RUSSELL A., Justice (dissenting).

I respectfully dissent. I do not view what the district court judge did here as an independent investigation. Rather, I would characterize the inquiry as a confirmatory follow-up to candid disclosure of extra-record knowledge regarding a frequent drug-court defendant. While the manner of the judge's inquiry might have been better handled to avoid giving rise to the claim on appeal, I do not believe that it tainted the whole proceeding such as to warrant a new trial. I would affirm.

On October 4, 2000, Lorenzo Dorsey was charged by complaint with a controlled substance crime that carried a mandatory minimum sentence when committed while in possession of a firearm. On December 6, 2001, LaTerrance Paige was shot and killed on a crowded city bus in Brooklyn Park. *State v. Fields*, 679 N.W.2d 341, 344 (Minn.2004). The gunman was apprehended in Chicago, Illinois on January 19, 2002 and subsequently indicted by a grand jury for first-degree murder on February 7, 2002. *Id.* at 345. Approximately two months later, Dorsey's controlled-substance-crime bench trial began in the afternoon of April 12, 2002.

Defense witness Pearl Worthy told the district court that a former boyfriend, LaTerrance Paige, would hide weapons in the couch and that she sold the couch to Dorsey after Paige died in May 1999. The prosecutor, apparently aware of the LaTerrance Paige who had died on December 6, 2001, asked Worthy a number of questions about Paige and his death. When the prosecutor asked if Worthy knew any members of Paige's family, defense counsel objected to the line of questioning as irrelevant. During the bench conference on the objection, the district court disclosed her familiarity with a LaTerrance Paige from drug court, stated her impression that his death was more recent, that the name was unusual and that her "guess" was that "there weren't two." In response, the prosecutor said "[w]ell, that is my point, Your Honor, to try to elicit some information so we can try to make a determination as to whether or not this is in fact the same person we are talking about." The district court then independently determined that the LaTerrance Paige known from drug court died on December 6, 2001, and made that information known at the end of the day. The prosecutor said she knew that, having obtained the same information over the "noon-hour."

Criminal defendants have a constitutional right to be tried before a fair and impartial judge. *Bracy v. Gramley*, 520 U.S. 899, 904–05, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997). The due process clause requires that a defendant receive a "fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Id.* (quotation and citation omitted); *see also In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases."). In considering a criminal defendant's due process claim, this court is mindful that " 'justice must satisfy the appearance of justice.' " *Pederson v. State*, 649 N.W.2d 161, 164 (Minn.2002) (quoting *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954)).

Judges are generally prohibited from independently investigating facts in a case and "must consider only the evidence presented." Minn.Code Judicial Conduct, Canon 3(A)(7) cmt. Likewise, jurors are prohibited from going beyond the evidence presented to them. "The exposure of a jury to potentially prejudicial material creates a problem of constitutional magnitude, because it deprives a defendant of the right to an impartial jury and the right to confront and cross-examine the source of the material." *State v. Varner*, 643 N.W.2d 298, 304 (Minn.2002) (quoting *State v. Cox*, 322 N.W.2d 555, 558 (Minn. 1982)). Upon discovery that a juror has been exposed to potentially prejudicial material outside the trial proceedings, the normal procedure is to examine the juror in camera to ascertain the nature of the material and whether the juror can remain impartial. Minn. R.Crim. P. 26.03, subd.

9; *cf. State v. Drieman,* 457 N.W.2d 703, 708 (Minn.1990) ("The test is whether a prospective juror can set aside his or her impression or opinion and render an impartial verdict.")

Here, the judge sitting as finder of fact fulfilled her obligation for candor, disclosing information that she believed might have a bearing on her ability to remain impartial. Minn.Code Judicial Conduct, Canon 3D(1) cmt. ("A judge should disclose on the record information that the judge believes the parties or their lawyers might consider relevant to the question of disqualification, even if the judge believes there really is no real basis for disqualification."). That the judge verified the date of death of a recent homicide victim whose name came up at trial, in my view, was more akin to a confirmatory follow-up of an immutable fact and not an independent investigation. *Cf. Harrison v. Anderson,* 300 F.Supp.2d 690, 706–10, 714 (S.D.Ind. 2004) (trial judge committed "forensic misconduct" in personal participation in development of pretrial proceedings, including the acquisition and presentation of his own evidence at a change-of-judge hearing); *Smith v. State,* 64 Md.App. 625, 498 A.2d 284, 289 (1985) (denial of due process where judge, through his law clerk, investigated allegations relating to defendant's probation violation and relied on information gained by the investigation to revoke probation); *State v. Oden,* 385 N.W.2d 420, 422 (Minn.App.1986) (holding that defendant was denied a fair trial where trial court obtained defendant's traffic record, provided the information to the prosecutor and permitted its use for impeachment); *State v. Vanmanivong,* 261 Wis.2d 202, 661 N.W.2d 76, 89–90 (2003) (concluding the circuit court erred when it independently requested additional information from law enforcement and relied upon that information in ruling on disclosure of identities of confidential informants; but holding error harmless in the context of the case).

I am also not so sure of the majority's assumption of the extrajudicial-source doctrine. Under Minnesota's Canon 3D(1) and 3D(1)(a), which is similar to statutory grounds for judicial recusal found at 28 U.S.C. § 455(a) and (b)(1) (2000),[1] a judge is disqualified whenever the judge's impartiality might reasonably be questioned, including but not limited to where "the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]" Under 28 U.S.C. § 455(b)(1), judicial recusal is limited to bias or prejudice arising from extrajudicial sources because "the pejorative connotation of the terms 'bias' and 'prejudice' demands that they be applied to judicial predispositions that go beyond what is normal and acceptable." *Liteky v. United States,* 510 U.S. 540, 552, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).[2] The extrajudicial source doctrine applies to section 455(a) as well. *Id.* at 552–53, 114 S.Ct. 1147.

As the *Liteky* author Justice Scalia noted, however, there is not much "doctrine to the doctrine." *Id.* at 554, 114 S.Ct. 1147.

1. 28 U.S.C. § 455(a) and (b)(1) provide:
 (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
 (b) He shall also disqualify himself in the following circumstances:
 (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]

2. The origin of the "extrajudicial source" doctrine is in the "pejorative connotation of the words 'bias or prejudice'" and not in the term "personal" contained in the federal judicial disqualification statute. *Liteky,* 510 U.S. at 550–51, 114 S.Ct. 1147.

The fact that an opinion held by a judge derives from a source outside judicial proceedings is not a *necessary* condition for "bias or prejudice" recusal, since predispositions developed during the course of a trial will sometimes (albeit rarely) suffice. Nor is it a *sufficient* condition for "bias or prejudice" recusal, since *some* opinions acquired outside the context of judicial proceedings (for example, the judge's view of the law acquired in scholarly reading) will *not* suffice. Since neither the presence of an extrajudicial source necessarily establishes bias, nor the absence of an extrajudicial source necessarily precludes bias, it would be better to speak of the existence of a significant (and often determinative) "extrajudicial source" *factor,* than of an "extrajudicial source" *doctrine,* in recusal jurisprudence.

*Id.* (emphasis original). The majority acknowledges that an extra-judicial source is neither a necessary nor a sufficient ground for disqualification but nonetheless appears to suggest that source—general judicial capacity—is determinative.

I recognize that the dichotomy between extrajudicial and intrajudicial sources has some value: "it provides a convenient shorthand to explain how courts have confronted the disqualification issue in circumstances that recur with some frequency." *Liteky,* 510 U.S. at 561, 114 S.Ct. 1147 (Kennedy, J., concurring). Nevertheless, difficulties in the application of the extrajudicial-source rule include understanding where the boundary lies between an intrajudicial and extrajudicial source.

Then there are the timeliness requirements for recusal motions. While 28 U.S.C. § 455(a) and (b) not contain specific timeliness requirements, some circuits impose a timeliness requirement upon section 455 generally, some require timeliness under section 455(a) and (b), and others draw a distinction between (a) and (b). *United States v. York,* 888 F.2d 1050, 1054 n. 6 (5th Cir.1989).

Inasmuch as the due process issue is dispositive in this case, I doubt that it is altogether necessary to reach the judicial disqualification issue. Under principles of judicial restraint, we generally refrain from "deciding any issue not essential to the disposition of the particular controversy before us." *Lipka v. Minn. Sch. Employees Ass'n, Local 1980,* 550 N.W.2d 618, 622 (Minn.1996).

In summary, I do not believe Dorsey has demonstrated structural error. He has not demonstrated that the judge was actually biased, as was the case in *Bracy,* 520 U.S. at 901, 117 S.Ct. 1793, or that the judge's behavior fundamentally affected the fairness of the trial proceedings. *See Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941). While the judge's inquiry following the disclosure of extra-record knowledge might have been regrettable, I do not think it can be deemed to have deprived Dorsey of a fair trial, particularly when considered in the context of the entire proceedings, including that Dorsey made no motion for judicial recusal.

BLATZ, Chief Justice (dissenting).

I join in the dissent of Justice Russell Anderson.

ANDERSON, G. Barry, Justice (dissenting).

I join in the dissent of Justice Russell Anderson.