*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1670**

State of Minnesota,
Respondent,

vs.

Michael John Mangan,
Appellant.

**Filed September 8, 2015
Affirmed in part, reversed in part, and remanded
Reyes, Judge**

Ramsey County District Court
File No. 62CR137634

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John Choi, Ramsey County Attorney, Thomas R. Ragatz, Assistant County Attorney, Matthew E. Anderson, Certified Student Attorney, St. Paul, Minnesota (for respondent)

Julie Loftus Nelson, Nelson Criminal Defense & Appeals, P.L.L.C., Minneapolis, Minnesota (for appellant)

Considered and decided by Reyes, Presiding Judge; Johnson, Judge; and Larkin, Judge.

## UNPUBLISHED OPINION

**REYES**, Judge

On appeal from his conviction of multiple counts of stalking and terroristic threats, appellant Michael John Mangan argues (1) the upward departure must be reversed

because it was based on improper factors and (2) an appearance of impropriety was created by the district court judge. We reverse the upward departure, remand for resentencing, but conclude that there was no appearance of impropriety.

**FACTS**

In September 2013, appellant had a conversation with his sister and brother-in-law in which he indicated that he had a plan to murder a number of individuals, including his ex-wife, B.L. Appellant indicated that he knew where B.L. lived and worked and that he was going to "take [her] out." Appellant also talked about "taking out" L.H., his ex-girlfriend and said that he had "made rounds" on L.H., B.L., and R.S., a pastor in appellant's and B.L.'s church. Appellant explained that "made rounds" meant that he had followed them to learn their routines. Appellant specifically stated that he had followed B.L. home from a park, followed L.H. home from work, and had driven by R.S.'s house and watched her take out the garbage.

Appellant's sister and brother-in-law reported this conversation to the St. Paul Police Department. On October 3, 2013, the St. Paul Police Department obtained a search warrant for appellant's home. The next morning, police stopped appellant while he was in his vehicle and recovered a black backpack which appellant referred to as his "range bag." Inside the bag was a handgun loaded with .357 hollow-point ammunition. There was an additional 200 rounds of ammunition found in the vehicle, along with a boot knife. They also recovered a laptop computer. A forensic examination uncovered a number of Google entries in which appellant had searched how to stalk, ambush, and kill someone with a knife or handgun. Appellant had also searched for information about the

2

people he told his brother-in-law he was planning to kill. Inside appellant's home, the police found a number of letters addressed to those people. Appellant had instructed his girlfriend at the time to make sure to deliver these letters to the people to which they were addressed.

Appellant was charged with 11 counts of stalking and terroristic-threat offenses. The alleged victims of these offenses were B.L., L.H., R.S., H.J. (also a pastor from appellant's and B.L.'s church), and J.M. (a police officer). J.S., a family court referee, was also named in the complaint as being a part of appellant's "hit list," but no charges concerning J.S. were ever filed. Appellant pleaded guilty to counts 2, 3, and 5 from the amended complaint and all other charges were dismissed. Count 2 charged appellant with felony pattern-of-stalking conduct with B.L. listed as the victim. Count 3 charged appellant with felony stalking with L.H. listed as the victim. Count 5 charged appellant with felony stalking with R.S. listed as the victim.[1]

Appellant waived his right to a jury trial to determine if any aggravating factors were present which would warrant a sentencing departure. At sentencing, the state sought an upward departure from the sentencing guidelines based on the evidence of appellant's preparation and planning. The district court agreed and sentenced appellant to an executed sentence of 72 months for count 5 involving R.S, which constituted an upward durational departure of 33 months. The district court also sentenced appellant to

---

[1] A stalking conviction is enhanced when the defendant has two or more qualified domestic-violence-related offenses. *See* Minn. Stat. §§ 609.749, subds. 2(1), 4(b) (2012). Appellant admitted to domestic-violence-related offenses involving B.L. within the last ten years.

18 months stayed for count 2 involving B.L. and 28 months stayed for count 3 involving L.H.  This appeal followed.

**D E C I S I O N**

**I.     The district court abused its discretion when it sentenced appellant to an upward departure**

A district court must impose the presumptive guidelines sentence unless "identifiable, substantial, and compelling circumstances" warrant an upward departure. Minn. Sent. Guidelines II.D (2010).  "Substantial and compelling circumstances are those showing that the defendant's conduct was significantly more . . . serious than that typically involved in the commission of the offense in question." *State v. Edwards*, 774 N.W.2d 596, 601 (Minn. 2009) (quotation omitted).  Whether to depart from the presumptive sentence is left to the district court's discretion.  *State v. Stanke*, 764 N.W.2d 824, 827 (Minn. 2009).  "The presence of a single aggravating factor is sufficient to uphold an upward departure." *State v. Mohamed*, 779 N.W.2d 93, 97 (Minn. App. 2010), *review denied* (Minn. May 18, 2010).  Sentencing departures are reviewed for an abuse of discretion.  *Taylor v. State*, 670 N.W.2d 584, 588 (Minn. 2003).

The parties disagree as to what facts were "available" to the district court in determining whether a departure on count 5, involving R.S., was justified.  In *State v. Jones*, the supreme court outlined a number of limitations on what facts can be relied upon for an upward departure, including that departures cannot be based on conduct underlying an offense for which the defendant was separately convicted.  745 N.W.2d 845, 849 (Minn. 2008).  However, "when a defendant is convicted of several offenses

4

involving multiple victims arising out of a single behavioral incident, a sentencing court may use 'overlapping' facts of those offenses as the basis for an upward departure." *Edwards*, 774 N.W.2d at 606-07. Relying on *Jones*, appellant argues that the district court could only review the conduct specifically relating to R.S. because R.S. was the only victim of the offense for which the departure was based. Relying on *Edwards*, the state argues that the multiple-victims exception applies and that the district court was free to consider appellant's conduct relating to all of the victims. We agree with appellant.

In order for the multiple-victims exception to apply, there must be several offenses with multiple victims and all of the offenses must arise out of the same behavioral incident. *Id*. at 606. While there are clearly multiple victims here, we are not convinced all of appellant's offenses arose out of the same behavioral incident. "[T]o determine if the offenses arose from a single behavioral incident, we generally consider the factors of time and place and whether a defendant is motivated by a single criminal objective in committing two intentional crimes." *State v. Bookwalter*, 541 N.W.2d 290, 294 (Minn. 1995); *see also State v. Jones*, 848 N.W.2d 528, 533 (Minn. 2014) ("Offenses are part of a single course of conduct if the offenses occurred at substantially the same time and place and were motivated by a single criminal objective."); *State v. Dick*, 638 N.W.2d 486, 490 (Minn. App. 2002) ("In determining whether the offenses are part of a single behavioral incident or course of conduct, courts examine (1) 'how the offenses were related in time and geographic proximity;' and (2) 'whether the actor was motivated by a single criminal objective.'"), *review denied* (Minn. Apr. 16, 2002). Because this is a mixed question of fact and law, "[w]e review the district court's findings of historical fact

5

under the clearly erroneous standard, but we review the district court's application of the law to those facts de novo." *Jones*, 848 N.W.2d at 533.

We cannot conclude on this record that the offenses occurred "at substantially the same time." *Id.* A determination of whether there is unity of time rests on whether the conduct was continuous throughout. *Compare State v. Schmidt*, 612 N.W.2d 871, 876 (Minn. 2000) (indicating that a pattern of harassment beginning in the summer of 1996 and ending in June of 1997 was deemed a single time period), *with State v. Richardson*, 633 N.W.2d 879, 888-89 (Minn. App. 2001) (concluding that there was no unity of time when the conduct was broken and sporadic over a period of four years); *but see State v. Bowen*, 560 N.W.2d 709, 712 (Minn. App. 1997) (stating that a pattern of conduct occurring over a span of two months could not be a single behavioral incident). Here, the record contains no information as to when any of the planning conduct relating specifically to R.S. took place. It is impossible to conclude that appellant's conduct relating to R.S. occurred at the same time as his conduct relating to the other offenses. Therefore, we cannot say that unity of time is present.

Furthermore, the offenses did not occur "at substantially the same . . . place." *Jones*, 848 N.W.2d at 533. In *Schmidt*, the supreme court held that conduct which occurred on the same street in front of multiple victims' homes satisfied the unity of place requirement. 612 N.W.2d at 876. Conversely, in *Richardson*, this court held that there was no unity of place where the four victims received threatening post cards at different locations. 633 N.W.2d at 889. Here, appellant "made rounds" at three separate locations—following B.L. home from a park, following L.H. leaving from work, and

6

going to R.S.'s home to observe her taking out the trash. This conduct more closely resembles that of *Richardson* than that of *Schmidt*. We thus conclude that the offenses did not occur at substantially the same place. *See Jones*, 848 N.W.2d at 533. Because there was no unity in time or place, the multiple-victims exception under *Edwards* does not apply.

Here, the district court based its departure on "the sophistication of [appellant's] preparation," which can be an appropriate factor to justify an upward departure. *See State v. Yaritz*, 791 N.W.2d 138, 147 (Minn. App. 2010) ("A defendant's high degree of planning is a recognized aggravating factor."), *review denied* (Minn. Feb. 23, 2011). However, when discussing appellant's planning, the district court failed to mention R.S. specifically and instead made general references to multiple victims:

> The plans were elaborate and detailed. [Appellant] was observed making rounds, following usual routes of *various victims* and found around *various buildings where victims were found*. . . . [T]he fact that it's clear that he had elaborate detailed plans regarding routes and *people* all show very detailed preparation. Defendant's actions have had a profound long-term effect on numerous *persons* and *institutions*. . . . *People*'s sense of security and safety has been lost and the recovery from that will take a long period of time. The fear and anxiety created by [appellant's] threats caused people to make significant changes in their life routines. *People* articulated over and over their fundamental sense of safety having been lost.

(Emphasis added). While R.S. certainly qualifies as a victim, we cannot determine from this record what specific factors were used to support the upward departure on appellant's sentence on count 5 relating to R.S. Instead, the district court relied on overlapping conduct from all of the victims, even though the offenses were not part of the same

7

behavioral incident. Accordingly, the district court abused its discretion by using "overlapping" facts as a basis for an upward departure. *See Edwards*, 774 N.W.2d at 607.

When the district court relies on a combination of proper aggravating factors and improper aggravating factors in making its sentencing decision, we may still affirm based on the proper factors "if we can conclude from the record that the district court would have imposed the same sentence absent its reliance on the improper aggravating factors." *Mohamed*, 779 N.W.2d at 100. "In doing so, we consider the weight given to the invalid factor[s] and whether any remaining factors found by the court independently justify the departure." *Stanke*, 764 N.W.2d at 828. But because the district court's sentencing justifications are not related to R.S. specifically and instead reference "people," "various victims," and "various buildings," we cannot conclude that the district court would have come to the same sentence if it relied solely on appellant's planning conduct associated with R.S.

We therefore reverse the district court's upward departure and remand for resentencing. We emphasize that in order to impose an upward departure on count 5, the district court would have to determine that defendant's conduct—relating specifically to R.S.—was significantly more serious than that typically involved in the commission of the offense. *See Edwards*, 774 N.W.2d at 601.

## II.     The district court judge did not create an appearance of impropriety

Criminal defendants have a right to an impartial and fair judge. *Cuypers v. State*, 711 N.W.2d 100, 104 (Minn. 2006). This court reviews de novo the legal question of

8

whether a defendant has been deprived of the right to a fair trial before an impartial judge. *State v. Dorsey*, 701 N.W. 2d 238, 246 (Minn. 2005).

Appellant argues that an appearance of impropriety was created because the district court judge who presided over appellant's first appearance, plea hearing, and sentencing was a colleague of J.S., a family court referee who was referenced in the complaint as being among those on appellant's alleged "hit list," although no charges were filed in relation to J.S. Appellant alleges that the district court judge's failure to state this information on the record amounts to a structural error requiring automatic reversal.

When structural error is present, automatic reversal is required because "without the basic protections of the right to . . . an impartial judge, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Id*. at 253 (quotation omitted). However, in order to establish structural error relating to a judge's impartiality, an appellant must first establish *actual* bias, not just the appearance of bias. *See State v. Munt*, 831 N.W.2d 569, 580 (Minn. 2013) ("Because we conclude that the judge's comments do not demonstrate actual bias, we need not, and do not, decide whether the alleged bias constitutes structural error."); *see also State v. Moss*, 269 N.W.2d 732, 734-35 (Minn. 1978). Appellant alleges that the district court judge exhibited actual bias by (1) setting an excessive bail amount and (2) referencing J.S. during sentencing. We disagree.

9

Following the state's recommendation, the district court set bail at $500,000. "The amount of bail to be fixed in a particular case rests within the discretion of the [district] court and its determination will not be reversed unless there is a clear abuse of that discretion." *State v. Huber*, 275 Minn. 475, 478, 148 N.W.2d 137, 140 (1967). While $500,000 is a significant amount, nothing in the record suggests that the district court judge abused her discretion or exhibited bias when she ordered this amount. At the first appearance, the state argued for a high bail amount because appellant was on probation for four separate cases, had three orders of protection against him, and scored a negative 35 on the bail evaluations form. That the district court judge would agree with the state's bail recommendation does not constitute actual bias.

Similarly, the passing reference to J.S. at sentencing does not exhibit actual bias. During sentencing, the district court judge stated:

> The fear and anxiety created by [appellant's] threats caused people to make significant changes in their life routines. People articulated over and over their fundamental sense of safety having been lost. Victims here didn't just involve larger entities like a church or people who work in a system, *like a family court referee* or other people who work in systems. And it should be noted that these systems are in place to assist members in the community. But, it also involved very real threats to at least three people who had what can only be called intimate relationships with [appellant].

(Emphasis added). "When reviewing a claim that a judge was partial against the defendant, we presume the judge discharged his or her judicial duties properly." *Munt*, 831 N.W.2d at 580 (quotation omitted). The district court judge made a single reference to J.S.'s job. Appellant does not allege that the district court judge had any personal

connection to J.S. other than the fact that they are both employed by the Ramsey County Court system. Appellant does not allege that the district court judge has ever met J.S., spoken to J.S., or even knows who J.S. is. Such an attenuated relationship is not grounds to question her impartiality. *Cf. Powell v. Anderson*, 660 N.W.2d 107, 118 (Minn. 2003) (determining that when pursuing an objective examination of an impartiality case where a judge has had an attorney-client relationship with an attorney appearing before the judge, a reviewing court can consider, among other factors, "the frequency, volume and quality of contacts"). Because appellant has not demonstrated actual bias, automatic reversal due to structural error is not warranted.

**Affirmed in part, reversed in part, and remanded.**